GREEN et al. v. COVILLAUD et als.

The law supposes that every suitor will state his case as strongly as the facts warrant; and hence the rule that a pleading is taken most strongly against the party making it.

The case of Brown v. Covillaud, (6 Cal., 568,) which is a case very similar to this, in its main features, disposes of the whole matter of this bill, as it originally stood; and this Court feels no inclination to disturb that decision.

A party seeking the legal enforcement of the stipulation of a concurrent obligation of the other party, must first show a compliance with his own.

A Court of Equity will not enforce a specific performance of the agreement to convey lands when the plaintiff shows no compliance or offer of compliance on his part with the agreement, nor any excuse therefor, for the period of twenty-one or twenty-two months from the time he bound himself to perform.

While time is not of the essence of the contract for the sale of land, ordinarily, yet in every case it will devolve upon the party seeking the relief to account for his delay, and, if there are circumstances showing culpable negligence on his part, or if the length of time which has been permitted to intervene, together with other circumstances, raise the presumption of an abandonment of the contract, or if the property has greatly enhanced in value in the meantime, and the purchaser has laid by apparently for the purpose of taking advantage of this circumstance, he will not be entitled to a decree in his favor.

This rule is especially applicable to such contracts in this State.

It is a cardinal rule in equity, as in all other pleading, that the allegata and probata must agree, and that averments material to the case omitted from the pleading can not be supplied by the evidence.

APPEAL from the District Court of the Tenth Judicial District, County of Yuba.

Thomas Elrod and Isaac Green filed their bill in the Tenth Judicial District against Charles Covillaud, J. M. Ramirez, William H. Sampson, G. N. Swezy, F. L. Aud, guardian of C. B. Sampson, a lunatic; S. C. Tompkins, executor of the estate of R. B. Buchanan; Minnie C. Buchanan, and George C. Briggs. The bill shows that the plaintiffs and one M. J. Turney and one Ezra Bligh, on the first of January, 1851, purchased of R. S. S. and said Buchanan, a tract of land near Marysville, containing about two hundred and twenty-six acres; that the purchase was made in consideration of $700, $100 being paid, and the balance in a promissory note, due first of October, 1851. That the endorsers executed, on their part, a bond, wherein they promised they would, "upon the payment of the promissory note at its maturity," execute and deliver to the vendees or their representatives "a good and sufficient deed of conveyance." That, at the time of this contract, the defendants gave the vendees the possession

of the tract, with the exception of a few acres, which were in possession of defendant Briggs, he being a settler under the government, claiming as such; that a short time afterwards, Briggs, well knowing that the vendees claimed the same, and to wrong and defraud them, wrongfully entered upon, took possession, and inclosed a large portion of said tract, leaving vendees in possession of not exceeding one-half of the quantity of land purchased by them as aforesaid; that the vendees continued in possession of the tract of land until the twenty-fourth of November, 1854, when plaintiff Green sold all his interest in the land to one Amy, who, with plaintiff Elrod, and Turney and Bligh, continued in possession of the portion before occupied until November, 1852, when Amy reconveyed to Green, and then Green and the others continued in possession until the twenty-ninth of August, 1853, when Bligh conveyed to Green, and they (Elrod, Green, and Turney) continued in possession until the fifteenth of May, 1855, when Turney conveyed to Green; and the plaintiffs have continued in possession to the time of filing the bill; that all these possessions have been with the knowledge and assent of the vendors; and vendees have made improvements to the value of $2000, and at all times asserted their right to the whole of the tract.

" Plaintiffs further show that soon after the execution of said note and bond and agreement, and before the note became due and payable, the title of said defendants (vendors) to said tract of land, which title they represented to be good at the time of the execution of said instruments, became greatly clouded and embarrassed; that the said tract of land *is supposed* to be a part of, and embraced within, a certain Mexican grant, known as the Cordera grant, claimed by defendants, (vendors;) that on the third day of March, 1851, Congress passed the act to ascertain and settle land claims, etc.; a Board of Land Commissioners, etc., was appointed, to hear proof, etc.; that on the first of April, 1852, vendors filed their petition before this Board for confirmation of this grant; that on the twenty-seventh of March, 1855, the Board heard the petition, etc., and affirmed the claim; that from the time that the passage of said act creating said Board was known in California, which was before the note became due, until the twenty-seventh day of March, 1855, the date of the confirmation of the claim, there was much uncertainty and doubt throughout the community in respect to the validity of said grant, and that in consequence thereof, the title of the said defendants and said C. B. Sampson and Buchanan became greatly depreciated, by reason whereof they were wholly unable to sell or dispose of the land supposed to be embraced within said grant, or any portion thereof, at any price whatever; and the plaintiffs say that, owing to the uncertainty and doubt with respect to the validity of the said grant, they, the plaintiffs, and said Tur-

ney and Bligh, after their said purchase, and up to the time of the confirmation of said grant, were subjected to repeated harassments, interruptions and aggravations," by trespassers, etc., and their title was not sufficient to maintain an action at law.

Plaintiffs further show that the note executed by them (Turney and Bligh) has never been presented to them, or either of them, for payment; that they have at all times been ready and anxious to pay said note and comply with their said agreement, whenever they could safely do so; but that by reason of the uncertainty of their title, it resting upon an inchoate Mexican grant, and being in a state of litigation between themselves and the government, the said vendees were not in a condition to comply with their agreement to execute a good and sufficient deed of conveyance to the said tract of land, as they promised, until the said twenty-seventh day of March, 1855, the time of the confirmation of the title as aforesaid; that afterwards, to wit, on the twenty-fifth day of April, 1855, plaintiffs and Turney (only parties then in interest) made a tender of $823 15, the amount then due on the note and interest, (at ten per cent. per annum,) which they refused to receive and execute a deed and surrender the note. The bill further charges that vendors sold to Briggs, in 1855, a portion of the land, etc.; the prayer is for the specific performance, etc. The bill is sworn to. The defendants demurred to it generally, specially, etc. The demurrer was overruled by the Judge below; and the defendants then answered, denying the allegations upon which the equity of the bill rested; setting up new matter, and pleading the Statute of Limitations of four years as a bar.

In January, 1857, and after the decision in Brown v. Covillaud, (6 Cal. Rep.,) the plaintiffs obtained leave to amend their bill; and filed an amendment in these words:

" The plaintiffs in the above-entitled cause, by leave of the Court, amend their original complaint, and say, that notwithstanding the. doubt and uncertainty of the defendants' title to the land, as described in the original complaint, and their inability to make a good and sufficient title and deed thereto until the twenty-seventh day of March, 1855, (the time of the confirmation of their grant, as mentioned in the original complaint,) that in the summer of 1853, they (the plaintiffs) and the said M. J. Turney and Ezra Bligh—who then owned an interest in the tract of land, and in the bond and agreement executed by the defendants Charles Covillaud and J. M. Ramirez, William H. Sampson, G. N. Swezy, and the said R. B. Buchanan and Charles B. Sampson, as described in the complaint—tendered to the said defendants, and said R. B. Buchanan and Charles B. Sampson, the full amount of plaintiffs' said note, including principal and interest, and demanded of them a good and sufficient deed to the tract of land described in their bond and agreement, and in

the original complaint, which they, the said defendants, and said R. B. Buchanan and Charles B. Sampson refused to make and deliver."

Answers were filed to the amended bill, and proofs taken on the part of the plaintiffs and defendants. They are voluminous; and it is not necessary in the view taken of this case to incumber this statement with them.

The Court below decreed a specific performance on the part of the defendants, and also gave judgment against them for costs, from which decree the defendants appealed to this Court.

*Reardan, Mitchell & Smith,* for Appellants.

1. We insist that time in this case is of the essence of the contract.

This case is precisely similar in its main features to the case of Brown *v.* Covillaud, 6 Cal. The same defendants there are defendants here; the bond in this suit is almost word for word with the bond in that. This whole case is *res adjudicata* in this Court.

In examining this case, (to use the language of Judge Murray in Brown et al. *v.* Covillaud et al., above referred to,) it will be necessary to look:

" *First*—At the letter of the contract.

" *Second*—At the circumstances under which it was made to ascertain the intention of the parties; and,

" *Third*—To the facts and circumstances which have transpired since its execution, to determine whether they take it out of the general rule first stated, namely, ' that time is not of the essence of the contract for the sale of real estate, unless made so by some express agreement of the parties.' "

Now, looking at the contract itself, we find it provides expressly that a deed is to be executed upon the payment of the note at its maturity.

Why were the words " at maturity " inserted? The instrument can not be construed without reference to them. Here, by express agreement of the parties, time was made a material element in the contract. The giving of the deed was made dependent upon the payment of the note at its maturity; so far, then, as the terms of the contract are concerned, plainer language could not have been employed. If we can ever arrive at the intention of the parties from their written agreements, we can do so in this case; the language is not ambiguous nor equivocal. Where is the necessity or justice in construing plain written agreements, when the intention of the parties is clearly expressed—to resort to refined criticisms? Courts can not make contracts for parties; they can only enforce them when once made. Who would believe that the plaintiffs would have accepted that bond if it had not been expressly agreed and under-

stood that the note should be paid at maturity, or otherwise the bond was to be of no effect?

Does any one suppose that plaintiffs, at the time, did not consider themselves bound to make punctual payment, and that their failure to do so would release the obligors from giving the deed? To think otherwise, would be equivalent to saying that the plaintiffs either did not read the contract, or did not comprehend the meaning of the simplest words in the language.

Again, time may be made of decisive importance in a contract of this kind. Taylor v. Longworth, 14 Peters, 175; Edgerton v. Peckham, 11 Paige, 353, 354.

Time may be of the essence of the contract from the very object of the sale, as in this case, where the object was to raise money to pay debts of the vendors, etc. Newman v. Rogers, 4 Bro. C. C., 393; Spunier v. Hancock, 4 Vesey, 667; Popham v. Eyre, Lofft, 786; Leading Cases in Equity, vol. 2, Part II, 20; 1 Sugden, 292.

2. In equity, the Court not only looks into the language of the contract, but when one party is in default, and seeks the aid of the Court, it will inquire into all the circumstances of the case, to see whether it would be equitable upon the whole to grant the relief sought. Story's Eq. Jur., § 776.

3. The whole conduct of the plaintiffs show that they intended to wait and see whether this contract would prove a gaining or losing bargain. Benedict v. Lynch, 1 John. Ch., 380; Willard's Eq. Jur., 292; Story's Eq. Jur., § 776 and note, and § 769; Rogers v. Saunders, 16 Maine, 92; Longworth v. Taylor, 1 McLean, 395; Edgerton v. Peckham, 11 Paige, 352; Select Cases in Eq., vol. 2, Part II, pp. 14–16.

*Chas. Lindley* and *C. H. Bryan* for Respondents.

1. Time is not the essence of the contract. Taylor v. Longworth, 14 Peters, 172; Gonlin v. Buckelew, 4 Cal., 107; Brown v. Covillaud, 6 Cal., 566; Edgerton v. Peckham, 13 Paige, 352; Benedict v. Lynch, 1 John. Ch., 379; Willard's Eq. Jur., 293, and cases there cited; 2 Story's Eq. Jur., §§ 747, 748.

If time was the essence of the contract, it was waived by subsequent declarations and promises of vendors. 1 Story's Equity Jur., § 776.

All objections as to laches in performance, were cured or waived by the subsequent conduct of defendants inducing plaintiffs to wait, promising to make deed as soon as title should be confirmed. Story's Eq. Jur., § 776.

The evidence shows that the title was in such doubt for a long time, that no man could safely buy, and made so by act of Congress after the execution of the contract. And it is a great public fact, of which the Court should take judicial notice, that all Spanish grants put in litigation in the Land Commission, and dis-

puted by the government of the United States, surround the title with such doubt and uncertainty as to excuse and suspend the performance of executory contracts like this for the sale of land, and to excuse the non-performance of the conditions thereof till confirmation. 2 Story's Eq. Jur., § 777, and note 7; also, § 778. But, notwithstanding all which, the plaintiffs offered to perform, at various times, from 1852 to 1855.

BALDWIN, J., after stating the facts, delivered the opinion of the Court—TERRY, C. J., concurring.

The law supposes that every suitor will state his case as strongly as the facts warrant; and hence the rule that a pleading is taken most strongly against the party making it. The plaintiffs' bill in this case, moreover, was sworn to. It is evident that the bill was framed upon the supposition that no duty of paying the note devolved upon the payors until the payees obtained a confirmation of title to the premises; and that the fact that the title was in litigation or uncertainty, was a sufficient excuse for non-payment, until that litigation was terminated and that uncertainty removed. Although the bill does not say so, in so many words, yet, by the rules of construction adopted in such cases, this averment is equivalent to the declaration that the payees had no claim on the payors for payment until they could make the latter a good title; that, in consequence of this litigation, doubt and uncertainty existed as to this fact of title; that the vendees, therefore, " could not safely pay;" that hence they were excused from payment or tender; that, accordingly, they were not bound, and did not offer to pay until after the confirmation of the title; and that the offer soon thereafter made was a compliance of the contract, in substance, on their part. In all this they were, it seems to us, clearly mistaken. The case of Brown v. Covillaud. (6 Cal. R., 568,) which is a case very similar to this, in its main features, disposes of the whole matter of this bill as it originally stood; and, for reasons which appear in the sequel, we feel no inclination to disturb that decision. It is true that the learned Judge of the Tenth District, in a vigorous opinion, delivered in this case, and incorporated into the respondents' argument, expresses the opinion that the weight of authority does not sustain the ruling of this Court in Brown v. Covillaud, which held that the words " good and sufficient deed," in a covenant, import only a conveyance good in form, and sufficient to pass the title actually held by the covenanter, and not that he would convey a good title. But we think the natural meaning of this language, as well as the number and weight of the authorities, are as this Court has decided in that case. The cases in New York and Massachusetts seem to be well considered, and are explicit on that point, (see 12 Johns., 436; 20 Ib., 130; 15 Pick., 552;) while the Kentucky cases, cited in the

argument of the counsel for respondent in Brown *v.* Covillaud, do not apply; for in those cases the covenant was to make *title*, not a deed.   If in this we were mistaken, we should not be disposed to overturn a solemn decision of this Court, sustained by such high and imposing authority.   Nor if we were so inclined, is it at all clear that it would avail the vendees; for it is not shown that they did not know the true state of the title, which was easily understood; and which, though subjected to the ordeal of examination by Commissioners appointed under a public law, passed before the maturity of the note, it seems has turned out to be all the vendors represented.   It appears to us that it would be pushing the doctrine contended for—even conceding it to have any claims to recognition—to extremes, to hold that every Mexican grantee who sold land, and took a note for the purchase-money, payable when a title was made, was bound by the contract to wait until it was ascertained what action the Board of Land Commissioners, or the United States District Court, or the Supreme Court of the United States, on appeal, would take upon the claim; for it is not shown by this bill that *this* claim was, in any wise, defective, or in any degree inferior, in law or equity, to any other land claim presented to the Board. It will not be seriously contended that the passage by Congress of the act for the ascertainment and settlement of land claims, of itself embarrassed or clouded any man's title; and yet the bill does not aver any other cause of embarrassment.   Nor can anything be made of the charge, that the vendors represented the title, at the time of the sale, to be good; for, as we have shown, it is not alleged in what, nor that, the title was not good.

This being the true state of the case, if we construe this agreement as a concurrent obligation, which is the most favorable view to be taken of it for the respondents, the party seeking the legal enforcement of the stipulations of the other must first show a compliance with his own. (15 Pick., supra.)   The vendees were only entitled to the deed on " payment (or tender of payment) of the note."   The whole matter, down to the filing of the amendment of the bill, is foreclosed by the decision in Brown *v.* Covillaud, which seems almost a counterpart of this bill.   The original bill being disposed of, the question left is, does the amendment alter the principle of decision in that case?   We will not stay to remark upon the apparent inconsistency of the two bills, nor to comment—for that is mere matter of proof— upon the suspicious nature of the amendment under the circumstances.   The question on the pleadings is confined to the legal insufficiency of the plaintiffs' own case as they have stated it.   The amendment professes to give a new excuse for plaintiffs' *laches*, in not paying or offering to pay the note : the first reason, as has been seen, was that they were not bound to pay it at all, until the confirmation of title—that " they could not safely do

it." The second explanation is, that though they were not bound to pay it, and could not safely do it until confirmation, yet they did, notwithstanding, offer to pay *sometime in the summer of* 1853. The note was due in October, 1851. The pleading being taken most strongly against them, we must then fix the time as late as possible consistently with the statement; we fix it the last of August, 1853. Nearly two years, then, elapsed after the note became due without any legal excuse of any sort for a failure to pay, upon a contract purporting to bind the payors to an absolute engagement of payment at a given time. We say no excuse is offered, for that made in the original bill has been passed upon in the case of Brown *v.* Covillaud, and found entirely nugatory. This question of law, then, arises on the face of the pleadings : Will a Court of Equity enforce a specific performance of an agreement to convey lands when the plaintiff shows no compliance, or offer of compliance on his part, with the agreement, nor any excuse therefor, for the period of twenty-one or twenty-two months from the time he bound himself to perform ? And this question, too, is decided, in effect, by Brown *v.* Covillaud, from which opinion the negative of the proposition results as a logical necessity. The Court—the late Chief Justice delivering the opinion—quote the judgment of Judge Story in Taylor *v.* Longworth (14 Peters, 172) : " And even when time is not thus, either expressly or impliedly, of the essence of the contract, if the party seeking a specific performance has been guilty of gross laches, or has been inexcusably negligent in performing the contract on his part, or if there has, in the intermediate periods, been a material change in circumstances affecting the rights, interests, or obligations of the parties—in all such cases Courts of Equity will refuse to decree any specific performance upon the plain ground that it would be unequitable and unjust. But, except under circumstances of this sort, or of an analogous nature, time is not treated by Courts of Equity as of the essence of contracts, and relief will be given to the party who seeks it, if he has not been grossly negligent and comes within a reasonable time, although he has not complied with the strict terms of the contract. But in all such cases, the Court expects the party to make out a case free from all doubt, and to show that the relief he asks is, under all the circumstances, equitable, and *to account in a reasonable manner for his delay and apparent omission of duty.*" This Court proceeds : " From the foregoing, which is but a concise statement of the principle, it may be gathered that, while time is not of the essence of the contract ordinarily, yet *in every case it will devolve upon the party seeking the relief to account for his delay,* and, if there are circumstances showing culpable negligence on his part, or if the length of time which has been permitted to intervene, together with other circumstances, raise the presumption of an abandonment of the contract, or if

the property has greatly enhanced in value in the meantime, and the purchaser has laid by apparently for the purpose of taking advantage of this circumstance, he will not be entitled to a decree in his favor." It will thus be seen that, so far from giving countenance to the idea that a party may wait for years, or even months, without fulfilling any part of his agreements, and then, when he thinks it his interest to intervene, come in and claim, as an arbitrary right, a literal enforcement of the contract which he has broken, it is laid down by the Court that, in every case of delay, a reasonable excuse for that delay must be given. In this case, as we have shown, this Court has decided there was no excuse at all.

We might rest this portion of the case here, but that the learned Judge below, while not professing an unwillingness to follow the decision of this Court in Brown v. Covillaud, yet has, in pointed—we will not say in too pointed—terms, expressed his dissatisfaction with that case; and we understand, besides, that many other cases exist in which the same general doctrine announced in that case applies. We propose, therefore, as briefly as possible, to give our views of the Law of Specific Performance, as applied to the records here, independently of the case before cited of Brown and Covillaud.

By the common law, a party to a contract was compelled to show a literal performance of the stipulations of it before he could claim damages for a non-performance against the other. But, in many instances, this was found to be a harsh rule. The ground of equitable relief is thus stated by the Chancellor, in Alley v. Deschamps (13 Vesey, Jr., 228): "This relief was first given upon a legal right, instead of damages; which was followed by another class of cases, equally clear, that where a party was not able to perform his engagement to the letter, if the failure was not substantial, the other should not be permitted to take advantage of the strict letter." This was a strong case. The Chancellor admitted that possession, on the faith of the agreement, had been taken; that £100 was paid in part satisfaction of the contract; but nothing further having been done until the premises became more valuable, the Chancellor asked, in the language of Lord Rosslyn, where was the equity of placing him in the same situation as if he had availed himself of the contract? The Chancellor said the Court ought not to interfere *unless it is clear that the party will have that for which he contracted.* It would be very dangerous to permit parties to lie by with a view to see whether the contract will prove a gaining or a losing bargain, and, according to the event, to abandon it, or, considering the lapse of time as nothing, to claim a specific performance, which is always a matter of discretion.

After chancery assumed jurisdiction of the question, it gradually extended the cases upon which it acted, and carried the

doctrine to comparatively great lengths; but, seeing the evils to which this extension gave rise, afterwards returned to a nearer approach to the ancient rule. The common expression that "time is not of the essence of the contract," probably never was understood by the Judges in the lax sense often imputed to those terms. The doctrine, even as far as carried, has been regretted by many eminent Judges, as encroaching upon the Statute of Frauds—since a contract executed to do a thing at a given time is not a contract to do. it in a reasonable time—and as encouraging a looseness of obligations in contracts. (See the observations of Lord Cranworth, V. C., in Parkin *v.* Thowold, 2 Sim. R., 57–8, and also 3 Randolph R., 246; Anthony *v.* Leftwich, opinion of Judge Carr, quoting Lord Redesdele's remarks in Harnett *v.* Yedding, 2 Sch. and Lefr., 549.) The leaning of the modern cases, especially in this country, is to tighten instead of to relax the rule. Mr. Parsons, in his admirable work on Contracts, (2 vol., 541,) makes these observations:

"A somewhat different question arises, or, if it be the same, it has a different aspect, when the parties have themselves agreed upon a time at which the title must be good, and shown to be so, and have made this time a part of the contract. If that time has elapsed, there can be no specific performance of the contract; and if the plaintiff asks for further time, he may be said to ask that the Court should make a new bargain, and not to seek the enforcement of the bargain he had made for himself. There may be given in answer to this, the rule in equity that 'time is not of the essence of a contract;' but we think it would be wiser and safer to express what is really meant by this rule, by saying that time is not *necessarily* of the essence of a contract. It certainly may be made so by the parties themselves, or by the circumstances of the case, although the parties say nothing about it. Thus, if a delay is asked by either party, and the Court give it, they never give an unlimited period, but name a day of reasonable distance, and refuse to go further. This rule is invoked in a great variety of cases, and is applied in many of them. And language is sometimes used in respect to it—possibly a use is sometimes made of it, which is not easily reconciled with the just duties and powers of equity. We can not doubt that the rule must needs be substantially this. The Court will always inquire into the time when a thing is to be done, as they will into any other part of the contract. If the thing to be done—whether a conveyance of land, or anything else—can be as well done at a later time, as an earlier, or the reverse, and certainly without detriment to the party called upon to do the thing, then time is not, in fact, of the essence of the contract, and will be regarded by the Court, or rather disregarded, accordingly, provided the parties have not themselves expressly agreed that the time shall be treated as essential, or made it so by their conduct. But if it

seems that the whole value, or a material part of the value of the transaction, to the defendant, depends upon its being done at a certain time, and no other, or that the substitution of any other will subject him in any way to loss or material inconvenience, then time is certainly of the essence of the contract, so far as he is concerned, and the Court will so regard it. And in deciding the question whether time be of the essence of the contract, or not, a Court of Equity could hardly fail to consider that the express agreement of the parties themselves upon a certain time, is strong though not conclusive evidence that it belonged to the essence of the contract. We said that time was not *necessarily* of the essence of the contract. *But at this period, and in this country, it usually is so in fact.* Very few transactions in business are isolated and independent. It is not often that one buys without making arrangements elsewhere for the purpose, or sells without having other things in view, and connected with this by distinct bargain, or at least by a definite plan and expectation. In other words, it must be true here in point of fact, that it is generally almost as material *when* a contract is carried into full effect, as *how* it is. It may not have been so formerly; but we think that both the moral and judicial equity applicable to existing usages will, for the most part, find *time* to be entitled to especial regard."

The good sense of these observations is conspicuous. The late English cases, especially Gee *v.* Pearce, (2 DeG. & S., 346,) tend the same way, the Vice-Chancellor, Sir Knight Bruce, observing in that case that a purchaser, not ready with the price, ought to show a very special case for the interference of this Court against the vendor. In Southcomb *v.* The Bishop of Exeter, (6 Hare, 213,) it is said the tendency of the Court, in numerous cases, has been to restrict the exercise of its jurisdiction to those cases in which the plaintiff has been prompt in seeking his equitable remedy.

Nor is it necessary that time be made essential by express contract, but will be held so when, from the circumstances, it must have been the intention of the parties. (1 Russel, 376; 1 Sim. & Stu., 590.) So, Chancellor Kent, in Benedict *v.* Lynch, (1 Johns. Ch., 373,) after reviewing learnedly the authorities, stated the general principle to be that time was a circumstance of decisive importance, but it might be waived by the conduct of the parties. It was incumbent upon the party seeking specific performance to show that he had used due diligence—or, if not, that his negligence arose from some just cause, or had been acquiesced in; that it was not necessary for the party resisting the performance to show any particular injury or inconvenience. It was sufficient if he had not acquiesced in the negligence of the other party. In Walker *v.* Jeffreys, (1 Hare, 348—23 Eng. Ch. R.,) the Vice-Chancellor said : " In contracts relating to land,

the time is not in general considered, in equity, as of the essence of the contract, and it was once considered that it could not be made so even by express stipulation. But after it had been decided that time might be made essential, the tendency of the decisions, especially of those of Sir John Leech, has been to hold persons concerned in contracts relating to land, bound, as in other contracts, to regard time as material. And this principle has been applied with the greater strictness where the property is connected with trade." Here the Chancellor cites a number of cases. The Chancellor adds: "These cases appear to me so sound in principle, that I certainly will not be the first to shake them." In several of these cases, there was possession. Anthony v. Leftwich, (3 Rand., 246,) is a strong case, in which relief was denied after possession and part performance.

In Rogers v. Saunders, (16 Maine R., 101,) is a learned and well-reasoned opinion, by Mr. Justice Shepley, covering all the points in this case, and reviewing the authorities. The delay in that case was from July, 1832, to December, 1834: the plaintiff had bound himself to take up some bonds of the defendant, but failed to do so. On tender afterwards, the defendants refusing, the plaintiff brought bill for specific performance, and the bill was dismissed. The Court, speaking of the rise in property, say: "According to the rules applicable to sales of estates in England, there could not, in this case, be a decree for a specific performance, and *there is less reason for it in this country*, and especially in a case relating to lands covered with a growth of timber, and having no fixed or certain value, but rising and falling in price according to the market for lumber, and greatly affected in value by other causes. In this particular, they more nearly resemble stocks; and time is of the essence of the contract in such cases, and no relief can be given." The remark of Livingston, J., in Hepburn v. Aud, (5 Cranch, 279,) applies with great force to this case. Speaking on this subject, he says: "But there is a vast difference between contracts for land in that country and this. There, the lands have a known, fixed, and stable value. Here, the price is constantly fluctuating and uncertain. A single day often makes a great difference; and in almost every case time is a very material circumstance." The Court further say: "Where its binding efficacy has been lost at law by lapse of time, Courts of Equity are in the habit of relieving, when time is not essential to the substance of the contract. *Time is of the essence, where the thing sold is of greater or less value according to the effluxion of time,* and the sale of a reversion and of stock are put as examples of the rule. So, when a house is known to have been purchased for a residence at a particular time, and when the parties have by their contract expressly so agreed, time is essential. And, in these cases, no relief is given against the lapse of time. It is not of the essence of the contract,

where the object is security for the payment of money; and in the ordinary case of the sale of an estate, the general object being the sale for an agreed sum, the time of payment is regarded as formal, and that stipulation as meaning that the purchase shall be compelled within a reasonable time, regard being had to all the circumstances. (1 Young & Collyer, 415.)    Time is not, however, in such cases to be altogether disregarded; but to entitle him to relief, where time is not essential, the party asking it must show that circumstances of a reasonable nature have prevented a strict compliance, or that it has been occasioned by the fault of the other party, or that a strict compliance has been waived.    Where he has been guilty of *laches*, and offers no satisfactory reason for it, and the other party has not waived or acquiesced in it, no relief can be granted."    In the case in 16 Maine, the Court say that, after the application of the vendee to the vendor to execute the contract, *that* was a circumstance which ought to have induced him to proceed punctually to perform his part of the contract.

In Lloyd *v.* Callett, (as reported in 4 Vesey, 689, note b,) the Chancellor says: "I want a case to prove that where nothing has been done by the parties, this Court will hold, in a contract of buying and selling, a rule that certainly is not the rule at law, that the time is not an essential part of the contract.    Here, no step has been taken from the day of sale for six months after the expiration of the time at which the contract was to be completed.    If a given default will not do, what length of time will do?    It is true, the plaintiff must have considered himself bound after the day; so he was: he could not take any advantage of his own neglect."    In Guest *v.* Homfray, (5 Ves., 818,) the Master of the Rolls says: "The only question is, whether the plaintiff has done enough to show he took all the pains he could to be ready to carry into execution the agreement."    The plaintiff does not seem to me to have done all he ought to have done.    It rests entirely upon that point.

Nor will equity give relief against the lapse of time, where there has been a very material change in the value of the property, making a great change in the condition of the parties.    In such cases, the utmost watchfulness is expected of the party not to let the contract fall.    In Paine *v.* Mellen, (6 Ves., 349,) the vendor did not perform in time, but the purchaser consented to complete the contract upon certain terms; and before the deeds were executed the houses were burnt.    It was held that the vendor could be relieved only by proving an actual acceptance of the terms by the purchaser before the loss.    In Brashier *v.* Gratz, (6 Wheaton, 539,) it is said: "Another circumstance which ought to have great weight, is the change in the nature of the land."    Had the land fallen in value, he could not have paid the purchase-money.    "Where the price agreed for in the original

contract greatly differs from the value, it is an ingredient which, associated with others, will contribute to prevent the interference of a Court of Equity. (Cathcart v. Robinson, 5 Peters, 264.) Nor where, from a change of circumstances since the contract, performance would be attended by peculiar hardship. (Perkins v. Wright, 3 Har. & McHen., 324.) Nor where the remedies are not mutual, and the chance for gain is all upon one side, and that of loss all upon the other. In Alley v. Deschamps, (13 Ves., 228,) the Chancellor says: "It would be very dangerous to permit parties to lie by with a view to see whether the contract will prove a gaining or losing bargain, and, according to the event, either abandon it, or, considering the lapse of time as nothing, to claim a performance." In Brashier v. Gratz, it is said: "Mr. Brashier, then, if he did not execute his part of the contract with punctuality, ought to have executed it before a great change of circumstances took place." "This total want of reciprocity gives increased influence to the objections to a specific performance, which are furnished by this great alteration in the value of the article."

Probably enough to satisfy the requirements of this case, may be found in Mr. Justice Story's familiar rule, that "in such cases, it should be clear that the remedies are mutual; that there has been no change of circumstances affecting the character or justice of the contract; and that he has shown himself ready, desirous, prompt, and eager to perform the contract."

Can it be said that a party who waits nearly two years "is prompt?" that one who distrusted his title is to be supposed "desirous" of paying the money on it? or that one who did not think he was bound to pay at all until after confirmation, was "eager" to pay before?

That time is not, in some instances of contract, of the essence of it may be very true; but the idea that in California, in 1851, '52, or even later, either the period of the conveyance of land or of the payment of the price was immaterial, or not an important element of the contract, seems to us plainly opposed to common sense. Unless we hold that the vendor considered a "slow note" as good as gold, and a chance to get the money in many months, (or, as it resulted in this instance, five years,) as good as a certainty of it in hand; or that ten per cent. per annum, if he wished it to stand on interest, as good as three or four per cent. per month, compounded, we do not see how this notion can be maintained; but it seems, from plaintiffs' own bill, that they did not even consider themselves bound to pay this, except in the contingency of a confirmation of the title. We are not making a new principle, but only applying the ancient rule to new circumstances. Circumstances may show, say the books, the intention to consider time essential, and then, if so shown, time is held material; and what circumstances could better show that

the intention of the vendors was to get the money at maturity, than the condition of California affairs, social, political, and financial, in 1851–2–3, and several years succeeding? Would any rational man, making a trade like this, and taking a note, consider it an essential alteration if asked to extend the time to eighteen months, with legal instead of usual rates of interest? Would a bargain, decreed by the Court for the money to be paid in that time, be *substantially* the bargain he thought he was making when he stipulated for it in six months? This view of the materiality of time becomes stronger, when we consider that the whole policy of our State legislation is based on the difference of time here and in older communities. Witness the Statute of Limitations in its shorter periods allowed for suits, the provisions for the early trial and disposition of matters of litigation, and the like; and the course of business operations in this State has been regulated by the same principle, and has shown a nearer approach to the cash system—or, at least, a more restricted system of credits than prevail elsewhere. This, indeed, was a necessity, arising from obvious causes—the want of confidence in men and titles, and the urgent demand for money to carry on business. In California, where such rapid and sudden fluctuations in the affairs and fortunes of men occurred, as in all history is unexampled, and where the work of years was accomplished in months, it is impossible to hold that time, as an element of past contracts, should be measured by the standards which obtain in old and settled States, where everything is comparatively stable and permanent; where capital is abundant, titles ascertained, and interest is low. The peculiar circumstances, showing the value of punctuality here, call for a corresponding rule, whereby the Courts should exact it; and we conceive that it would be as unjust as impolitic and demoralizing to make new contracts for parties, by extending time they never intended to give; for it would be to encourage a violation of engagements, and foster a spirit of reckless speculation.

We confine these observations, of course, to the case made by this record, and to analogous facts; they are not meant to apply—for that question is not now before us—to cases in which the vendee has performed the contract on his part, and has merely neglected to call for the legal title; nor are they applicable to all cases of failure of prompt compliance by vendees.

We have not overlooked the fact that in this case the decree was rendered upon proofs, which seek, in important respects, to vary the case made by the pleadings. But this is immaterial. A plaintiff's case can not be better, as proved, than it is as stated. It is a cardinal rule in equity, as in all other pleading, that the *allegata* and *probata* must agree, and that averments material to the case, omitted from the pleading, can not be supplied by the evidence; or, as said in Woodcock *v.* Bennett, (1 Cowen, 711,)

"in a Court of Chancery every material allegation should be put in issue by the pleading." Thus, in Bank U. S. *v.* Schultz, (3 Ohio, 62,) held that "a party can not travel out of the matter alleged in his bill to make a ground of relief; and accordingly the Court, even upon an agreed state of facts, refused to find upon facts not put in issue by the bill. In 3 Randolph, (supra,) Judge Carr says : "It is incumbent on every party who brings his case before a Court, to state it with reasonable certainty, and to prove it as stated; and this is peculiarly necessary upon a bill for a specific performance." See, for this familiar rule, 3 Greenleaf Ev., (new ed.)

If, however, we entered upon the unnecessary labor of reviewing the mass of testimony, the argument of the appellants' counsel is certainly imposing. It is not easy to say that a case is "free from doubt or suspicion," where the bill implies a contradiction in substance, upon its face, of the main facts on which it rests. Where the original bill avers a tender in 1855, and an excuse for not making it sooner; then an amended bill, after the decision of Covillaud *v.* Brown, discovers for the first time that the tender *was* made sooner; then the proofs showing that it was repeatedly made much sooner than last alleged : that the vendees refused to list the property for taxes as theirs, though often applied to, while they gave in their improvements : that the taxes on the land have been ever since suffered to be paid by vendors : that these pretended tenders, except the last, are inconsistent with what the vendees claim in their bill to be their rights, under the contract; that if made for proof—as evidently they were made, if made at all—no better and more satisfactory evidence of demand, etc., has been preserved ; that except the last, they appear for the most part to have been proved by witnesses alone severally present with the parties—the loosest and most unsatisfactory species of evidence admissible in law, (as the Appellate Court of Kentucky terms it;) that one of the parties to whom the tender is alleged to have been made is dead, and another insane; that one of the vendors was about this time insolvent; that neither have been shown to be men of property: the inherent improbability that these vendors understood they were to postpone payment until the confirmation of title, for, if rejected, they would get nothing—if confirmed, only the contract price; and when, if they warranted title, at most they would only have to pay back the money; and by delay of confirmation, as it *was* delayed, the Statute of Limitations would bar their claim : that this loose verbal evidence is contradicted by the terms of the contract, and, to some extent, by the *unquestioned acts* of the parties : the suspicious circumstance that the attempt legally to enforce the contract is not made, and the formal tender which seems to be preliminary to it, did not take place until after the confirmation, and the consequent rise in the

value of the property : the high rate of interest the vendors were paying, the urgency of their pressure for money; consequently the folly of the contract as alleged, and the apparent want of reason in the vendors' alleged *desire* not to receive the money, *or give a deed,* before confirmation : and that the claim has been partially assigned;—all these facts, we repeat, certainly weigh very strongly against the case made by plaintiffs to the discretion of the Court for equitable relief, when to give it would operate very harshly on one side, and be only a successful speculation without risk on the other.

But it is enough to say that the case made by their bill does not entitle them to a decree. We therefore reverse the decree below, and direct a decree dismissing the plaintiffs' bill.

[Field, J., having been counsel in the Court below, did not sit in the case.]