[Civ. No. 1256.   Third Appellate District.—January 20, 1915.]

A. L. FARRINGTON et al., Respondents, v. F. E. Mc-
CLELLAN, et al., Defendants; F. E. McCLELLAN,
Appellant.

Contracts—Sale of Real Estate—Broker's Commission—Findings—
When Conclusive.—In this action by a broker to recover compen-
sation for negotiating the sale of certain real property it is held
that the finding of the trial court, upon conflicting evidence, that
the agreements sued upon were not executed upon the understanding
that if one of the defendants, who was the wife of the other, should
refuse her consent they should become null and void, is conclusive on
appeal.

Husband and Wife—Community Property—Presumption—Right of
Husband to Sell and to Appoint Agent Therefor.—Property
conveyed to a married man after his marriage, and while the mar-
riage relation exists, is presumed to be community property; and
while the husband cannot make a gift of such property or convey it
without a valuable consideration, unless the wife, in writing, con-
sents thereto, nevertheless he has the management and control of
such property, with absolute power of disposition other than testa-
mentary; and having power to sell it without the consent of his wife
he has the right to authorize another without the wife's consent to
sell the property for him in consideration of any compensation which
may be satisfactory to him and his agent.

Id.—Execution of Contract by Husband for Wife and Self—Alleged
Variance.—In such a case where the complaint alleged that the
agreements sued upon had been executed by both the husband and
wife, there was no fatal variance between the pleading and proof
where the evidence showed that the husband had no authority to fix
his wife's name to the contract, it appearing that the property covered
by the contract was community property and that the contracts upon
their face purported to impose a joint and several liability upon
the defendants.

Id.—When Commission Earned.—The rule in regard to the payment of
the commission of a real estate broker is that if, within the time
limited, the broker has produced a purchaser who is ready, willing
and able to purchase upon the terms prescribed, the principal cannot
evade the payment of the broker's commission by then refusing or
neglecting to consummate the sale, or by changing the terms, or by
selling the property to another, or by so negligently dealing with the
proposed purchaser as to lose the benefit of the sale.

Id.—Performance of Contract by Broker.—It is held in this action
that the plaintiffs within the time limited by the contract procured a

purchaser for the property in question who was ready, able, and willing to purchase the same, and were entitled to recover their commission.

APPEAL from a judgment of the Superior Court of San Joaquin County. C. W. Norton, Judge.

The facts are stated in the opinion of the court.

A. H. Carpenter, for Appellant.

Carlton C. Case, for Respondents.

HART, J.—The controversy here arises out of certain agreements alleged in the complaint to have been entered into between the plaintiffs and the defendants whereby the latter agreed to pay the former certain compensation for negotiating the sale of certain real property situated in the city of Stockton.

Judgment was awarded the plaintiffs as against the defendant and appellant, F. E. McClellan, in the sum of three hundred and fifty dollars (the amount sued for), with interest thereon from the first day of February, 1913. Furthermore, in accordance with the prayer of the complaint based upon averments thereof that the contract declared upon contained a misdescription of the property involved, the court adjudged and decreed that said contract be so reformed as that the same be described therein according to its true description.

The complaint alleges that, on the eleventh day of November, 1912, the appellant, F. E. McClellan, executed and delivered to the plaintiffs a writing whereby the latter were invested with authority to sell or procure for him a purchaser of the property referred to in the complaint for the sum of three thousand nine hundred dollars, net, and in cash, within sixty days from the date of said writing, "and thereafter until notice in writing be given the said Farrington & Hubbard of the withdrawal of said property, and if a sale of said property shall be negotiated during that time, I promise to pay the said Farrington & Hubbard a commission of any amount above $3,900.00."

It is further alleged that, after the date of said instrument, "and within the time therein provided, and in pursuance of the terms thereof, the plaintiffs procured a purchaser,

to wit, Stockton Grove, No. 118, U. A. O. Druids, ready, willing, and able to purchase the said property for the sum of four thousand two hundred and fifty dollars''; that the plaintiffs negotiated a sale of said property with the said purchaser and thereafter the said purchaser entered into a written agreement with the defendants to purchase the said real property for the sum of four thousand two hundred fifty dollars, and thereupon tendered to the defendants the said sum of money, ''and the said sum is now in possession and under the control of said defendants''; that, on the nineteenth day of December, 1912, another writing or agreement, purporting to have been executed and signed by both F. E. and Minnie McClellan, the defendants, was delivered to the plaintiffs, and which reads as follows: ''In consideration of commission earned by A. L. Farrington and F. B. Hubbard, composing the real estate firm of Farrington & Hubbard, in the sale of our property consisting of Lot Number 8, in Block Number 33, east of Center Street, in Stockton, California, we, or either of us, agree to pay to the said Farrington & Hubbard out of the final payment for said property, which is due and payable February 1st, 1913, by Stockton Grove, No. 118, U. A. O. Druids, the sum of $350.00.''

Both the above-mentioned writings are set out in the complaint *in haec verba.*

A demurrer to the complaint, interposed by both defendants, having been overruled, the latter filed separate answers in which they specifically denied the averments of the complaint and set up certain special defenses. In her answer, by way of a special defense, the defendant, Minnie McClellan, alleged that, when the agreements above referred to were made, she was an invalid, that she was often required to take opiates, for relief from the great physical pain from which she was suffering, with the result that, during the period of time covering the negotiations and transactions mentioned in the complaint, she was incapable of understanding business transactions of any kind, and that she had no knowledge of the agreements set out in the complaint or of any matters appertaining thereto until the 24th day of December, 1912, when the transaction involved here was explained to her, ''to the effect that the alleged agreements had been signed by her husband for her, subject to her approval, and that she then

and there refused to ratify said proposed agreements or either of them, or to be bound by any of the provisions thereof.''

The special defense interposed by the appellant involves the charge that the plaintiff, Farrington, obtained the contract of December 19, 1912, ''by means of threats, misrepresentation, fraud, concealment and unfair practices,'' the nature of which is described with considerable particularity in the answer but which it is believed to be unnecessary to explain here, since there is no serious claim that there is evidence which supports that charge.

The facts of the transaction upon which the action is founded as the same were developed by the evidence from which the court evidently made its findings are, substantially: On the eleventh day of November, 1912, the plaintiff, Farrington, and the appellant met on one of the streets in the city of Stockton and there held a conversation in the course of which the appellant asked the said plaintiff (who was then, with the plaintiff Hubbard, engaged in the buying and selling of real estate in said city) if he could not sell the property referred to in the complaint. After some discussion, the appellant said he would take three thousand nine hundred dollars, net, for said property and agreed that the plaintiffs might retain, as their compensation for selling or procuring a purchaser of the property, all that they might receive for the same in excess of that sum. Farrington thereupon prepared a written contract embracing the terms stated and, as seen, giving the plaintiffs sixty days, or thereafter until notice of the termination of the contract was given them by the appellant, within which to make the sale. It appears that the lot was erroneously, and doubtless inadvertently, given to Farrington by the appellant as ''No. six'' in the block in which it is situated, whereas it was, in fact, lot No. eight, in said block, and that this error was not discovered until after the execution of the contract of November 11, 1912, authorizing the plaintiffs to sell the property upon the terms above specified. Parenthetically, it may be said that no question could arise as to the particular lot to which the agreement was intended to relate, since it does not seem to be disputed that the lot which it was the understanding that the plaintiffs were given authority to sell was the one upon which the appellant's blacksmith shop stood and that that was the lot to which the transaction referred.

After the making of the said agreement, the plaintiffs advertised the property for sale in a Stockton newspaper at the sum of four thousand two hundred and fifty dollars and also made other personal efforts to sell it. Within sixty days from the date of the authorization granted to the plaintiffs to sell the property, they negotiated the sale of the same to a fraternal organization in the city of Stockton, known and designated as Stockton Grove, No. 18, U. A. O. Druids, for the sum of four thousand two hundred and fifty dollars. The trustees of the Druids deposited with the plaintiffs the sum of two hundred dollars as the initial payment on the purchase price and the plaintiffs thereupon reported the sale to the appellant and tendered him the sum so deposited. The appellant refused to accept the two hundred dollars, saying that he desired a deposit of two hundred and fifty dollars, or fifty dollars more than the amount so deposited. Thereupon the plaintiffs secured from the trustees of the Grove an additional fifty dollars and the full sum of two hundred and fifty dollars was thereupon paid by Farrington to and received by the appellant. This occured on the nineteenth day of December, 1912, and at the same time the appellant executed the commission agreement pleaded in the complaint and above referred to and also entered into a written contract with the Grove of Druids, or its trustees as the agents of said organization, whereby he agreed to sell the property to that organization for the sum of four thousand two hundred and fifty dollars. It appears, as her answer alleges, that the defendant, Minnie McClellan, at the time of these transactions, was an invalid, confined to her bed and was suffering from such an intensely painful malady as to make it necessary to frequently administer to her opiates or other pain-destroying narcotics, and that, as a consequence, she was not capable of transacting business. The appellant, however, signed his wife's name to the instruments.

After the above mentioned transaction, Mrs. McClellan refused to give her assent to the same, and of this Farrington was informed over the telephone by the daughter of the defendants. Later he interviewed the appellant, who explained that his wife's condition was such as to render her incompetent to transact business but assured Farrington that the deed "would be signed later." Subsequently (on the first day of February, 1913), Edward F. Harris, cashier of the Commer-

cial and Savings Bank of Stockton, accompanied by the plaintiffs and one Tweed, representing the Druids, called at the home of the defendants for the purpose of paying them the balance of the purchase price of the property. The appellant was not at home at the time. His son-in-law, one Cassidy, was there, however, and when the absence of the appellant was made known to the visiting party, Harris stated to Cassidy that he was there to pay the McClellans the balance of the purchase price, and asked permission to tender it to Mrs. McClellan. She was yet confined to her room, but, having been apprised by Cassidy of the purpose of the presence of Harris and his companions, returned word that she would accept neither the money nor a tender thereof; whereupon Harris pinned upon the hat rack in the house a written tender of the money. On the same day, the trustees of the Druids delivered to the sheriff of San Joaquin County a written notice, addressed to the defendants, which notice recited the circumstance of the attempt by Harris, as above explained, to pay or tender to the defendants the balance of the purchase price of the property, to wit: the sum of four thousand dollars, and which contained the further statement that the said money was then on deposit in the said Commercial and Savings Bank to the account of the defendants. The sheriff served said notice on the appellant on the first day of February, 1913.

It was shown that the property concerned here was acquired by the appellant through a deed from one Henry J. Kuechler on the first day of February, 1908, which was, according to the evidence, during the coverture of the defendants.

The appellant testified that he was wholly without authority to affix his wife's name to the agreements of December 19, 1912, and that the understanding which was had between all the parties was that said agreements should possess no binding force unless or until his wife, when sufficiently restored to health to understand their nature, either subscribed her own name to the same or otherwise ratified them. But Farrington positively contradicted that testimony and declared that there was no such conversation or understanding, he having been present when both the agreements were made and signed by the appellant. It is, therefore, plainly apparent that upon that question there is a decided conflict in the proofs.

The appellant makes no claim in his brief that the evidence is insufficient to sustain the finding upon which the court decreed a reformation of the instrument conferring upon the plaintiffs the authority to negotiate the sale of the property. It is contended, however, that there exists a fatal variance between the agreement of December 19, 1912, and the evidence in this: that, while said agreement, as pleaded, purports to be the agreement of the defendants, the name of each appearing to have been subscribed thereto, the evidence shows that it was never signed, acquiesced in, nor ratified by the defendant, Minnie McClellan, and that it was, therefore, the agreement alone of the defendant, F. E. McClellan. Like objection is urged as to the contract, made on the same day that the above mentioned commission agreement was executed, and wherein the defendants are purported to have joined, and whereby the latter purport to agree to sell the property to the Druids for the sum of four thousand two hundred and fifty dollars.

The specific contention with respect to said agreements is two-fold, to wit: 1. That, to impart to them binding force, it was essential that the wife of the appellant, Minnie McClellan, should have become a party thereto; 2. That the appellant signed both agreements and without her consent attached his wife's name thereto with a distinct understanding with the plaintiffs and the representatives of the proposed purchaser (the Druids) that, if the said Minnie McClellan should refuse to assent to the agreements they would become null and void and should be canceled. In other words, the proposition is that, although the appellant signed the agreements and subscribed the name of his wife thereto, it was agreed by and between all the parties that the validity or binding force of said instruments should entirely depend upon their subsequent ratification by the defendant, Minnie McClellan. It is hence argued that, the wife having repudiated the agreements after their execution by the appellant or refused to assent to or ratify them, the instruments became nullities and were from the beginning without binding force upon either of the defendants.

First taking up the proposition last above stated, it is sufficient to say that a conclusive reply thereto is to be found in the fact, hitherto shown, that Farrington testified that no such understanding as that upon which the validity of said

proposition may be sustained was had between the parties, and, although, as before stated, there appears to be a direct conflict between Farrington and the appellant upon that point, the testimony of the former, under the well-known rule relative to conflicting evidence, must be accepted by this court as having established the fact found from it by the trial court, viz.: That the agreements were not executed upon any such understanding or agreement, or, in other words, were made by the appellant without any such qualification or condition as that referred to by him.

Nor is there a fatal or any legal variance between the agreements involved here and the proofs. The evidence, as we have seen discloses that the property involved here was conveyed to the appellant after his marriage to the defendant, Minnie McClellan, and while the relation of husband and wife existed between them. The presumption is, therefore, that said property belonged to the community. (Civ. Code, sec. 164.) While the husband cannot make a gift of the community property or convey it without a valuable consideration, unless the wife, in writing, consents thereto, he nevertheless has the management and control of such property, "with the like absolute power of disposition, other than testamentary." (Civ. Code, sec. 172.) From the provisions of the code thus adverted to, it follows that the appellant had the legal right to sell the property without the acquiescence or consent of his wife. This proposition being true, he had the right to authorize another, without the consent of his wife, to sell the property for him in consideration of any compensation which might be satisfactory to him and his agent. This course he appears to have adopted, and the next question to be considered is whether the commission agreement pleaded in the complaint is materially different from the one proved.

As seen, the pleaded agreement purports to have been executed by both defendants, but the evidence shows and the court finds that, while the appellant signed said agreement, the defendant, Minnie McClellan, did not, and upon this, as before stated, it is claimed that a variance between the pleading and proof as to that instrument arises, and that the findings, conforming to the evidence adduced in proof of the pleaded agreement, describe a different agreement from the one set out in the complaint.

The learned counsel for the appellant cites many cases in which the rule relating to the doctrine of variance is clearly expounded and well applied. (See *McCord* v. *Scale,* 56 Cal. 264; *Stout* v. *Coffin,* 28 Cal. 65; *Stearns* v. *Martin,* 4 Cal. 227; *Green* v. *Covillaud,* 10 Cal. 317, [70 Am. Dec. 725].) It is not, however, considered important to review those cases here. It is enough to say that, while no fault can be found with the conclusions therein arrived at or the reasoning leading thereto, they are not deemed to be in point in this case. The said agreement, as pleaded, provides that "we *or either of us* agree to pay Farrington & Hubbard," etc., and thus it appears that upon its face or in form it created a joint and several obligation, and would have bound both parties jointly or either severally, if both had signed it. But, as the evidence shows it to have been made, the agreement is solely that of the appellant and by it, obviously, he as effectually bound himself to its terms as though in form of language it imposed or created or purported to create none other than a several liability or obligation against him. (See *Melander* v. *Western National Bank,* 21 Cal. App. 462, 471, [132 Pac. 265]; 9 Cyc. p. 656.)

The remaining question is whether the plaintiffs performed the contract to sell the property and are, therefore, entitled to be paid for their services in so doing according to the terms of said contract.

Relative to contracts whereby real estate brokers are authorized to sell property for others on commission, the following well-settled rules may be stated: "If, within the time limited, the broker has produced a purchaser who is *ready, willing and able* to purchase upon the terms prescribed, the principal cannot evade the payment of the broker's commission by then refusing or neglecting to consummate the sale, or by changing the terms, or by selling the property to another, or by so negligently dealing with the proposed purchaser as to lose the benefit of the sale." (Mechem on Agency, sec. 967.) And it has been held that where the broker has performed his part of the contract, "he will be entitled to his commission, although the sale is not consummated because the principal's title proves defective (*Hamlin* v. *Schulte,* 34 Minn. 534; [27 N. W. 301]; *Goodridge* v. *Holliday,* 18 Ill. App. 363; *Gonzales* v. *Broad,* 57 Cal. 224; *Knapp* v. *Wallace,* 41 N. Y. 477; *Doty* v. *Miller,* 43 Barb. (N. Y.) 529; *Sibbald*

v. *Bethlehem Iron Works,* 83 N. Y. 378, [38 Am. Rep. 441]),
or because the principal's wife refuses to join in the convey-
ance (*Clapp* v. *Hughes,* 1 Phila. 382), or because the purchaser
refuses to complete the sale on account of false representa-
tions made by the principal.'' (*Glentworth* v. *Lenther,* 21
Barb. (N. Y.) 145. See, also, *Justy* v. *Erro,* 16 Cal. App.
519, 522, [117 Pac. 575] where the cases just mentioned are
cited.)

Under the principles thus stated, the rule as to contracts
of the character of the one under consideration may be reduced
to this simple formula: That the procurement and produc-
tion by the broker of a purchaser at all times ready, willing,
and able to purchase the property at the price fixed by the
owner will entitle the broker to the stipulated commission,
even though, through no fault of the broker or the proposed
purchaser, the sale be not consummated. It follows, therefore,
that, whether there be a variance between the contract be-
tween the Druids and the owner of the property for the
sale thereof, or, indeed, whether the proposed purchaser en-
tered into any such written contract with the seller at all,
is immaterial, so far as the issue involved here is con-
cerned. Thus the sole proposition in this case is finally re-
duced to the single question whether the plaintiffs, in
pursuance of their contract with the appellant, procured
and produced, within the time limited by said contract, a
purchaser ready, willing, and able to purchase said property.
That they did do so, it seems to us there can be no manner
of doubt under the evidence. As seen, they, within the time
specified in the contract with the appellant, not only found
and produced a purchaser ready, willing, and able to pur-
chase the property at the price specified in the contract, but
did all that lay within their power to actually consummate
the sale at said price. They paid to the appellant a deposit
of two hundred and fifty dollars made by the purchaser upon
the purchase price of the property and thereafter caused to be
tendered to the appellant the balance of the purchase price.
And there can be no possible doubt that the purchaser pro-
duced by the plaintiffs was not only ready, willing, and able
to purchase the property but that it was anxious to do so,
for it appears that the purchaser deposited the balance of
the purchase price in a Stockton bank to the account of the
defendants, and thereafter, upon the refusal of the defend-

ant to convey the property to it, brought and sustained an action, in the superior court of San Joaquin County, against the appellant for the specific performance of his agreement so to convey.

We have discovered no just reason for disturbing the judgment and it is, accordingly, affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 18, 1915.