Samuel Kahn v. The Old Telegraph Mining Company et al.

SAMUEL KAHN, Appellant, v. THE OLD TELEGRAPH MINING COMPANY et al., Respondents.

1. General Issue in Ejectment.—Under the denial of the title of plaintiff in the answer, the defendant can give in testimony any title in himself at the commencement of the suit, without specially pleading it.

2. Supplemental Answer — What to Contain.—Any title to the premises in dispute that accrued to the defendant after the commencement of the suit must be set up by a supplemental answer, otherwise defendant cannot avail himself of it.

3. Termination of Plaintiff's Right During Suit.—Where it is claimed that the plaintiff's right has terminated during the pendency of the action, the fact cannot be shown unless pleaded by a supplemental answer by defendant; otherwise if the fact appears from the plaintiff's own evidence.

4. Patent from Government after Suit.—A patent from the Government to the defendant for the premises in dispute, issued after the commencement of the suit, must be pleaded by a supplemental answer.

5. Motions Affecting Pleadings.—It is the better practice to bring motions designed to affect the pleadings and settle issues, to a hearing before a cause is called for trial.

6. Patent Title—Relation of.—A patent title, when granted, relates back to the first initial valid step, which is the foundation of the right and in pursuance of which the patent is issued.

7. Patent Title—Relation of.—As a location notice in the acquisition of mineral lands is the first step in that direction, the same is proper evidence in connection with the patent to show the claim to which the patent refers.

8. Expert Testimony.—Expert testimony proper is given on questions of science, skill or art, by persons educated or experienced and deemed competent to speak concerning the matters in issue; but on matters which are open to common observation, and in regard to which a jury are supposed to have knowledge or experience, the witness must state the facts only and not give opinions.

9. Expert Testimony as to Continuity of Vein.—The question as to the continuity of a vein discussed, and under the facts held that expert testimony was admissible upon the question.

10. Opinions as Evidence.—While the opinions of experts are not the safest evidence, and are liable to great abuses, still when they constitute the best available form of evidence they must be resorted to from necessity.

11. DEFENDANT NOT CONFINED TO ONE TITLE.—In ejectment, under a claim of the defendant that he is the owner of the premises in dispute, he can support such claim by showing that he has several different titles thereto.

12. ONE FORM OF ACTION, ETC.—While all the forms of action have been abolished by the Code, the inherent distinction between legal and equitable causes of action, and the remedies appropriate to each, are not changed.

13. GRANT BY PATENT WHEN ATTACKED.—It is now settled that, in an action of ejectment, in certain cases a patent of the United States may be shown to be void. As in instances where the patent is void upon its face, or issued without authority, or its issue prohibited, etc.

14. GRANT BY PATENT WHEN ATTACKED.—Where the government had the title and it passed by the grant, it can only be recalled or made subject to equitable interests of other parties by an.action in equity brought for that purpose; and in such cases, although fraud may have been practiced or other parties held superior equities the patent is not void, but only voidable in equity.

15. GRANT BY PATENT WHEN ATTACKED IN LAW ACTIONS.—The rule is otherwise in actions at law, for in such cases the patent can be attacked only upon the ground that it is void in its issuance.

16. WANT OF AUTHORITY TO ISSUE PATENT.—The want of authority which will make a patent void is a total want of authority to issue the same for the subject of the grant, and not a latent impropriety in exercising the authority by reason of unknown impositions moving to its exercise.

17. EQUITABLE DEFENSE MUST BE SET UP.—An equitable defense may be set up in an action of ejectment, but such defense must contain all the essentials of a bill in equity, and the issue thus made is triable by the court, without a jury, as an equitable issue.

18. EQUITABLE DEFENSE MUST BE SET UP.—This rule does not, however, avail a plaintiff who bases his claim on a legal title, and is met by a superior legal title of defendant; in such case he cannot be permitted to attack the title of defendant on purely equitable grounds.

19. EJECTMENT A SUIT OF TITLE.—In an action of ejectment the question is as to who has the better title; therefore, before a defendant can prevail on an inferior or equitable title, he must first, in equity, subject the better title to him. He must become an actor and invoke equitable affirmative relief.

20. STATUTORY DENIALS OF ANSWER.—Where the statute provides that the allegations of the answer shall be deemed to be denied, this does not take the place of a bill in equity on which to grant affirmative relief.

21. PATENT OF MINING CLAIM.—A patent to a mining claim passes whatever title the government had to the surface and any vein or veins beneath it not otherwise granted; and its issuance presumes a compliance with the mining laws.

22. PURCHASING ADVERSE TITLES.—One who purchases an adverse title to his premises is not estopped from denying that such title is not good. One has a right to " buy his peace."

23. NOTICE OF LOCATION.— A notice of location of a mining claim should contain a description of the premises located, and the same should be marked on the ground.

Appeal from the Third Judicial District Court.
The facts appear in the opinion.

*Robertson, McBride & Hoffman,* for appellant.

The first error alleged is that the motion to strike out the supplemental answer was refused by the court below.

There being, as shown by the evidence, no surface conflict between the " Montreal " claim, and the " No You Don't," " Nez Perces Chief," and " Third Extension of the Telegraph " claims, and therefore no opportunity to file any protest or adverse claim, these patents were issued *ex parte* as to the plaintiff, and if any conflict afterwards arose by development, the patents had no tendency to decide that conflict, namely as to the identity of vein. They were, therefore, irrelevant to the issue on that question, and if admissible on other grounds their bearing should have been limited by the court by a proper ruling. A party's rights, even in judicial proceedings, are not affected unless he is made a party to the proceeding, and has had an opportunity to be heard. 1 Copp's Mining Decisions, pp. 17, 27, 28, 96 to 104; 9 Cranch. 144; 1 Gr. Ev. § 522; 1 Wall. 109; 1 Otto, 510; 51 Cal. 289.

The facts set up by the supplemental answer were inconsistent with the original answer, and both could not be allowed to stand against the objection. 17 Cal. 128; 2 Bosw. 678; 4 Sand. 680; 9 Abb. Pr. 444; 14 Cal. 115.

The facts alleged in the so-called supplemental answer were not supplemental.

The applications for patents were all made prior to the filing of the original answer, and some of the entries had been made at the land office. None of these facts were supplemental

and could not be set up in such a pleading. Gould Pl. 345 *et seq.;* 30 Cal. 465; 4 Cal. 331.

Besides, patents only bind "subsequent" claimants, and never bind parties claiming title prior to their issuance, unless there is provision for a hearing of the rights of such parties, and they neglect those rights.

On the fourth assignment, as to the admission of expert testimony, we cite 17 Wend. 136; 44 Cal. 542; 4 Otto, 469.

As to the fifth assignment; the evidence was inconsistent with and in contradiction of the defendants' sworn allegations in the answer filed. That it was not admissible is shown by the following authorities: 35 Cal. 302; 14 Cal. 115; 32 Cal. 131; 40 Cal. 246; 41 Cal. 133, 278; 42 Cal. 219; 51 Cal. 151.

The sixth and seventh assignments will be considered in connection with the errors assigned in the instructions.

The first objection to the instructions is against number two. We cite 2 How. (U. S.) 285; Mining Acts, 1866, 1872.

The next objection is to instruction number three. It does not construe the statute, or if so, does it incorrectly. Wells' Law and Fact, 290; 22 Iowa, 274; 5 Cal. 40; 16 Cal. 432, 243.

But the subject of the instruction was not an issue before the jury; the answer admitted the allegations of the complaint both as to the facts of location and description, and no issue on the description was before the jury. 1 Nev. 350; 14 Cal. 508; 18 Cal. 433; Wells' Law and Fact, 294, 400, 353.

From the instruction number four to number thirteen, the theory of the instructions is mainly as to the effect of the patents, and the exclusion of all testimony impeaching them, and will be considered together.

We claim that the miner who enters upon public mineral lands and complies with the laws has a vested title, a conditional fee. That the law, when united to his acts, makes him a title, which the government itself cannot divest, any more than it can take away any other private property of the citizen. 1 Mont. 414; 3 Wall. 105, 780; 13 Stat. at Large, 441; Mining Laws, 1866 and 1872; 4 Otto, 762; 1 Deady,

Samuel Kahn v. The Old Telegraph Mining Company et al.

108; 1 Sawyer, 132; 2 Oregon, 262; 2 Otto, 733; 5 Oregon, 104; 13 Pet. 200; 51 Cal. 288.

Even if the patent would have the effect of a quit-claim from the government, it would be subordinate to the possessory title existing in another at the date of its issue. 13 Pet. 200; 1 Mont. 414.

That this right of the miner cannot be taken away. 6 Cr. 128; 9 Cr. 82; 5 Opinions Atty. Gen. 7; 21 Wall. 62; 9 Pet. 236; 6 Pet. 738; 8 John. 555; 9 How. 333.

The patents having been issued to carry the property right and title already owned by another, were void, as having been issued without authority of law, and in an action at law the facts could be shown and full effect given to them. 9 Cr. 87; 5 Wheat. 294; 11 Wheat. 380; 2 How: 317; 2 Pet. 236; 18 How. 87; 1 Black. 132; 1 Wall. 109; 16 How. 507; 6 Wall. 160; 3 Otto, 209.

These cases have been followed in California and are admitted law everywhere. 16 Cal. 324–5; 24 Cal. 609; 25 Cal. 251.

That the facts we offered to prove would have been admissible in equity to avoid the effect of the patent is well settled. 9 How. 333; 2 Black. 554; 22 How. 192; 1 Pet. 212; 13 Wall. 84.

While in the Federal Courts no merely equitable defense can avail against a patent (except when it is void), save in equity, that is not the rule under the code; the defense is just as available in a law action as it is in equity. 13 Cal. 494; 19 Cal. 660; 22 Cal. 607; 12 N. Y. 266, 156; 31 N. Y. 399; 8 Nev. 92; 9 Nev. 192; 16 Iowa, 175, 186, 434.

And even in the Supreme Court of the United States, if the appeal is from a State Court where the code prevails, allowing equitable defenses to a legal title, it enforces the equitable defense. 1 Black. 139; 1 Wall. 109.

And the defense is available, although, as with us, the pleadings terminate with the answer. Prac. Act. § 65; 17 Mass. 366; 13 How. 336; 19 Cal. 477; 49 Cal. 301; 3 Cal. 52.

In Iowa, which is one of the few States that has abolished

the replication, the same rule is the settled practice. 16 Iowa, 77; 17 Iowa, 33; 23 Iowa, 111; 43 Iowa, 229.

There is a large class of cases where the patent is conclusive of the legal title, and cannot be impeached except by the government. When the party seeking to impeach the patent "is a stranger to the source of title," and his claim is " subsequent" to the patent he will not be allowed to contest it. It is this class upon which the defendants rely to sustain the instructions in this cause, but they do not apply. *Moor* v. *Wilkinson*, and *Waterman* v. *Smith*, in 13 Cal.; *Doll* v *Meader*, 16 Cal. 324; 27 Cal. 483; 17 Cal. 250; 28 Cal. 100; 29 Cal. 312; 18 Cal. 433; 38 Cal. 83. And numerous decisions in the Supreme Court of the United States which are in full accord with them.

These decisions are based upon the " status " of the party seeking to attack the patent. If it appears that he has no rights, the. courts refuse to allow him to attack a patent, where if he succeeded he would not be benefited. A bare inspection of these cases will show that they can have no bearing on a case where the defendant claims a vested right by law anterior to the date of the patent.

These instructions embody the doctrine (skillfully drawn to conceal it, however,) that a party may follow his lode, if it is found at a single point in his surface grounds, to the full length of the claim, and within the end lines projected on the dip at that apex. It is the most objectionable form of the swinging doctrine, and has been directly repudiated by the court below in other cases since heard and decided in that court.

We object to the sixteenth and seventeenth instructions, given for the defendants, for the reasons assigned in the exceptions, and cite: 2 Pet. 235; 9 Wheat. 673; 9 Pet. 733, 680, and authorities cited.

To sustain our objection to the twentieth instruction for defendants, we cite: Wells' Law and Fact, 351.

Without citing further authority upon the exceptions to the

instructions given at defendants' request, many of the author-
ities already cited applying to them, we come to the exceptions
filed to the refusal to give the instructions requested by the
plaintiff.

The third request has already been considered in connection
with the defendants' instructions to the same point.

Number four was refused because it did not give effect to
the patents of the defendants.

This is no ground of refusal. If the instruction was good
law, as stated, it should have been given, and if the defendants
thought it necessary to have attention called to any other
matter proper to be considered by the jury in the same con-
nection, they could have asked the additional matter to be
given, but could not defeat the instructions. Wells' Law and
Fact, 197, 307.

Instruction number six should have been given. The facts
on which it was based were clearly before the jury and the law
is plain. 23 Cal. 198, 203; 28 Cal. 569; 30 Cal. 490; 42 Cal.
120; 1 R. & M. 49.

Instruction number nine was improperly refused. 9 Cal.
662; 39 Cal. 125; 21 Cal. 552.

Instruction number ten was improperly refused. To refuse
it was to take all the facts tending to prove a tenancy in com-
mon and co-partnership away from the jury.. If the evidence
was admissible the jury had the right to weigh it and the
court had not. Wells' Law and Fact, 424, 425 *et seq.*

Number eleven was improperly refused. The authorities
cited in support of the right of the plaintiff to set up an
equitable defense to the alleged legal title of defendants, are
referred to in support of the instruction as requested by
plaintiff.

Number twelve was improperly refused. Patents are con-
clusive only against parties claiming by title subsequent. 14
Cal. 465; 24 Cal. 192; 33 Cal. 74; 34 Cal. 506; 37 Cal. 389.

Number thirteen was improperly refused. It is the admitted
general law, and has been applied repeatedly to cases of mines.

No single respectable decision can be found against it. We cite: 6 Cal. 172; 4 Cal. 70, 33; 17 Cal. 112; 38 Cal. 487; 2 Johns. 22; 10 Johns. 355; 14 Eng. C. L. 742; 20 Eng. C. L. 156; 4 Nev. 66.

When the law as laid down in this instruction ceases to be the law of the land, property will cease to have an existence, and private rights are at the mercy of any man who can with force invade them.

*Bennett & Harkness*, for respondents.

The acquisition of title by a defendant, pending the action, can only be shown by supplemental answer. *McMinn* v. *O'Conner*, 27 Cal. 238; *Moss* v. *Shear*, 30 Cal. 467; *Bagley* v. *Ward*, 37 Cal. 121; *Reilly* v. *Lancaster*, 39 Cal. 354.

The admission in evidence of deeds and patents to show title in the defendants was not error. A defendant in ejectment may show title in himself or a stranger without pleading it. Tyler on Ejectment, p. 564; 2 Greenleaf's Ev. § 331; *Dyson* v. *Bradshaw*, 23 Cal. 528.

A plea of title by a defendant as a defense, after a general denial of plaintiff's title, is argumentative, amounts to only a general denial, and may be demurred to or stricken out on motion. *Marshall* v. *Shafter*, 32 Cal. 176; *Bruck* v. *Reason*, 42 Cal. 346.

A supplemental answer, however, must show the facts occurring pending the action, and in this case the acquisition of title in fee being the fact, it was proper and necessary to plead such title specially.

There was no error in overruling appellants' offer to prove abandonment of the No You Don't, and fraud in procuring surveys and patents.

He had no vested rights on which to attack the patents, and actions for that purpose should be brought by the United States. *Hughes* v. *U. S.*, 11 How. 552; Same Case, 4 Wall. 432; *U. S.* v. *Stone*, 2 Wall. 525.

The issue on trial before the jury was an issue in an action

at law, and in such cases the patents were conclusive evidence of title. *Patterson* v. *Winn*, 11 Wheat. 380; *Bagnall* v. *Broderick*, 13 Pet. 436; *Jones* v. *McMasters*, 20 How. 8; *Gibson* v. *Chouteau*, 13 Wall. 92; *Durfee* v. *Plaisted*, 38 Cal. 80; *Estrada* v. *Murphy*, 19 Cal. 248; *Clark* v. *Lockwood*, 21 Cal. 220.

In an action at law a patent can be attacked only in the following cases: When it is void on its face, or issued without authority, or its issue is prohibited by law, or when the government by reason of a prior grant had no title. In a few cases relating to agricultural lands (in analogy to the peculiar practice of the States in which the cases arose) the Supreme Court has allowed a junior patent, on a prior entry, to over-reach by relation the elder patent in an action at law. The last class of cases is not applicable to mineral lands. *Polk* v. *Wendall*, 9 Cranch. 87; *Ross* v. *Reed*, 1 Wheat. 482; *Ross* v. *Barland*, 1 Pet. 655; *Stoddard* v. *Chambers*, 2 How. 284; *McCarty* v. *Roots*, 21 How. 426; *Durfee* v. *Plaisted*, 38 Cal. 80.

In all other cases at law, the patent, as will appear from authorities cited, is conclusive evidence of title, and can only be attacked in equity.

Where equitable defenses are allowed in an action of eject-ment, the answer is in the nature of an original bill in equity and must contain all its essential averments. *Gibson* v. *Chateau*, 13 Wall. 92; *Bruck* v. *Reason*, 42 Cal. 349.

The sixth instruction reiterates the effect of the patent, and states its effect by relation. The patent when granted relates to the initial step under and in pursuance of which the right is acquired. *Landers* v. *Brandt*, 10 How. 348, 372; *French* v. *Spencer*, 21 How. 228; *Lynch* v. *Bernal*, 9 Wall. 315; *Stark* v. *Starr*, 6 Wall. 402; *Shepley* v. *Cowan*, 1 Otto, 330, 337; *Eyster* v. *Goff*, 1 Otto, 521, 523; *Jackson* v. *Ramsay*, 3 Cowan, 75; 13 Cal. 478; 14 Cal. 465; 17 Cal. 250; 20 Cal. 150.

The patent presumes a compliance with all the requisites to its issue by the grantee and officers allowing and executing it.

*Folk* v. *Wendall*, 9 Cranch. 87; *Patterson* v. *Winn*,, 11 Wheat. 380; *Bagnall* v. *Broderick*, 13 Pet. 436; 44 Cal. 371; 38 Cal. 80.

EMERSON, J., delivered the opinion of the court:

The appellant, who was plaintiff in the court below, in April, 1876, brought an action of ejectment against the respondents, to recover an undivided one-third of the Montreal mining claim, and in his complaint sets out a possessory title under a location of the claim on the 6th day of June, 1873, and a subsequent compliance with the mining laws and customs by the locators and their grantees. The appellant alleged title by a grant of one-third (five hundred feet) from two of the locators, on the 19th day of December, 1874; an ouster by respondents April 10, 1876, and a subsequent unlawful withholding.

The complaint also contains a second and equitable cause of action, for an accounting for one-third of the profits of working the mine, and asking both a provisional and a perpetual injunction and a receiver.

In May, 1876, the respondents answered to the first cause of action by denying the title of the appellant, and the alleged possession and ouster, and to the second cause of action by further setting up a possessory title to an older mining claim called the No You Don't, and that the alleged Montreal vein, and the only vein in that claim, was a part of the No You Don't vein, and belonged to the respondents.

In this part of the answer the respondents admitted they were in possession of the vein, claiming to own it, but they set up no claim of title to Montreal surface ground.

The facts set out in the answer to the second cause of action were pleaded both as a defense, and as a counter-claim and basis for affirmative equitable relief, quieting their title, and for an injunction.

To this part of the answer, as a counter-claim, the appellant interposed a demurrer, which was not disposed of until after the trial of the law issue.

On the 10th of March, 1877, the respondents, on motion, were permitted to file a supplemental answer, in which they set up that since the commencement of the action they had acquired patent title from the United States for the No You Don't, the Nez Perces Chief, the Third Westerly Extension of the Telegraph, the Roman Empire, and the Montana mining claims, and also a certain interest in the Grecian Bend mining claim; that all these were on the same lode or vein; that the course and apex of the lode was in the No You Don't claim on the top of the hill, and that the parallel end lines of the No You Don't claim extended vertically and continued in their own direction down the dip of the vein toward the Montreal mining claim, included all of the vein in the Montreal; also, that the other claims mentioned, with a like extension of the end lines, would include, some of them all and others a portion, of the vein in the Montreal.  That a portion of the surface ground of the Montreal was within each of the Montana, the Roman Empire and the Grecian Bend mining claims, and that the Roman Empire embraced the Montreal discovery point.

The locations of these claims, excepting the Nez Perces Chief, are alleged to be prior to the location of the Montreal.

The motion for leave to file this supplemental answer was served by the respondents on the appellant, and a copy of the answer was served with the motion papers.

A jury trial was had in the Third District Court, commencing April 30, 1877, which resulted in a verdict and judgment for the respondents.

A motion for a new trial was made and overruled, and the appellant brings the case to this court on an assignment of various errors in law occurring at the trial.

Before the trial commenced the appellant filed his motion to strike out parts of the supplemental answer, on the ground that the parts mentioned in the motion were immaterial, redundant and irrelevant, constituted no defense, and that many of the facts existed at the time of filing, and were inconsistent

with, the original answer. The parts specified in the motion included the whole of the supplemental answer except a few introductory lines.

The refusal of the court to grant the motion is the first alleged error.

The Practice Act, C. L., § 1291, provides that " the plaintiff and defendant respectively, may be allowed, on motion, to make a supplemental complaint or answer, alleging facts material to the case occurring after the former complaint or answer; that the making of supplemental complaint or answer shall not be a waiver of the cause of action set up in the former complaint, or of the defense set up in the former answer."

C. L. § 1282, provides that, " if irrelevant or redundant matter be inserted in a pleading, it may be stricken out by the court on motion of any person aggrieved thereby."

It is also provided, C. L. § 1481, that " in an action for the recovery of real property, when the plaintiff shows a right to recover at the time the action was commenced, but it appears that his right has terminated during the pendency of the action, the verdict and judgment shall be according to the fact, and the plaintiff may recover damages for withholding the property."

The respondents in their original answer to the first cause of action had not set out any title in themselves. On the trial under that answer, they could have shown in themselves any title or titles sufficient or tending to defeat the action, and which they held at the time of its commencement. Had they then held the titles set out in the supplemental answer, it would not have been necessary to plead them specially, but as they accrued afterward, it was necessary to set them out specially, in order to comply with the provision of the statute that the " facts material to the case," arising subsequent to the former pleading must be alleged, and in order to enable the court, on motion, to see that the alleged facts are material. Neither could the respondents on trial, and without a supplemental answer, have put these patents in evidence, under

§ 1481, for the purpose of defeating the action from the date of the patents, and limiting a recovery of damages to that time. *Moss* v. *Shear*, 30 Cal. 467; *Hardy* v. *Johnson*, 1 Wall. 374; *Bagley* v. *Ward*, 37 Cal. 121; *Reitz* v. *Lancaster*, 39 Cal. 354.

These decisions are made under the same statutes as ours, and in effect limit the words "but if it appears that his (plaintiff's) right has terminated during the pendency of the action," occurring in § 1481, to cases where it so appears on the plaintiff's evidence, and they expressly decide that the affirmative fact that the plaintiff's right has ceased pending the action cannot be shown as a defense unless pleaded supplementally.

It, therefore, appears that the respondents could have made no use of these patent titles unless they were pleaded in a supplemental answer.

The titles set out in the supplemental were not inconsistent with the original answer, which set out no special title in the respondents, and they were not immaterial because it is alleged each covers and grants some part of the demanded premises.

A patent from the United States for any portion of the premises in controversy cannot be immaterial or irrelevant as evidence of title in an action of ejectment.

It is further argued that the supplemental is inconsistent with the original answer because it pleads several patents, and hence assumes as many different veins, while the original answer alleged one continuous vein from the No You Don't down to and beneath the surface of the Montreal. This last allegation is found in the answer to the equitable cause of action, and assuming that that answer constitutes a part of the pleadings on the law issue, (a position not affirmed or denied,) it is not clear that there is any inconsistency in this respect. This question will be more fully considered hereafter in connection with other alleged errors.

Another objection to the supplemental answer is that many of the facts existed at the time the original answer was filed.

The supplemental answer does not plead as a defense anything but the subsequently acquired titles. In respect to the claims patented it does not allege their location, the citizenship of the locators, their subsequent occupation, and the performance of work or making improvements thereon, or any compliance with mining laws and customs, either specially or prior to the patent; nor is there any general averment in order to establish an independent possessory title under the mining laws. Neither on the trial did the respondents give any evidence of such compliance with mining laws, but in their instructions asked, they insisted that their patent titles were not only sufficient but conclusive evidence of title in the action. The only evidence of work done on these claims as assessment or statute work, appearing in the respondents' evidence, is in the cross-examination of respondent, Holden, by appellant's counsel.

The locations of the patented claims are pleaded under a recital of their dates, and it is alleged the patents were issued on proof to the proper officers of a compliance with the mining laws. These facts are evidently stated for the purpose of giving relation to the effect of the patents as evidences of title, and for that purpose they were competent in a supplemental answer, although the facts existed prior to the original answer. In legal effect they were a part of the patent title.

These views render it unnecessary to determine whether as a question of practice the motion could be properly made at that time and in that manner. It is not the usual way to settle issues. It would be better practice to bring motions designed to affect the pleadings and settle issues to a hearing before the cause is called for trial. *Smith* v. *Countryman*, 30 N. Y. 655.

When the court permitted the pleading to be filed its materiality was passed upon, for it is only material facts which are allowed to be thus pleaded. The motion required the same court, and on the same state of facts, to review its former order, to which no exception appears to have been taken. At all events the appellant had and exercised the right to object to evidence under the pleading.

On the trial the respondents put in evidence the several patents named, the location notices of the several claims patented, a chain of conveyances from the locators and their intermediate grantees down to the patentees and respondents, and proved that the applications for the several patents were made under the location notices offered and received in evidence.

To each instrument in these chains of title the appellant objected that it was immaterial, irrelevant and incompetent, and the second and third assignments of error are based on their reception in evidence.

In respect to the patents, the objection follows the motion to strike out the supplemental answer, and it has already been said that is not immaterial, and hence evidence tending to support it must be held material.

Patent titles, when granted, relate to the first initial valid step, which is the foundation of the right and in pursuance of which the patent is issued. *Stark* v. *Starrs*, 6 Wall. 402; *Yount* v. *Howell*, 14 Cal. 465; *Ely et al.* v. *Frisbie et al.*, 17 Cal. 250. Numerous cases to the same effect might be cited.

As the location is the first step in the acquisition of mineral lands and the foundation of the title thereto, the respondents following the allegations in their answer put these location notices in evidence. They are not set out in the record, but as chains of conveyances down to the patentees and respondents, were put in evidence, it may be assumed that the respondents were not the locators, and if not, then the connection between the patent and the location notice was not complete, even for the purposes of relation, until these connecting evidences were put in. Without them the respondents would have patent title, but it would not appear that that title was connected with the location notices. For the purposes for which this evidence was offered it was clearly admissible and material, unless the argument that portions of it were repugnant to both the original and supplemental answers be well

founded; and this question in connection with others will be hereafter considered.

The fourth assignment of error relates to the admission of what is called expert testimony.

Whether or not the witnesses were competent to speak as experts, was a question of law, to be decided by the judge on the trial. The evidence of their competency or otherwise is not set out, but only a general statement embodied in the record giving the result of their testimony on this point, and from that general statement there does not appear to be any error in the ruling so far as competency is concerned. The objection to the testimony seems to be based on the ground that a full tracing was claimed by respondents between the No You Don't and the Montreal, and that the witnesses should only state what they saw in the connecting works, leaving the jury to determine the question of continuity without an opinion from the witnesses. In brief, that the subject matter was not a proper one for expert testimony.

Expert testimony proper is given on questions of science, skill or art, by persons educated or experienced, and deemed competent to speak concerning the matter in issue. Such persons may give their opinions in evidence, not only on facts within their own observation, but on facts detailed by other witnesses, or on a hypothetical case stated. They may also in certain cases, give their opinion as to the existence of latent, or invisible or unknown facts or things, from other facts indicatory of them. As a general rule, however, as to matters which are open to common observation, and in regard to which a jury are supposed to have knowledge or experience, the witness must state the facts only and may not give opinions. There are many exceptions to the last rule, and many cases in which witnesses having no special education or experience in the matter, and on subjects open to common observations, may state opinions; and these opinions, although sometimes classed as expert testimony, are not such, and rest on a different reason and necessity. In these cases, however, the

witness is never allowed like the expert, to state an opinion as to the existence of latent facts from the apparent ones, nor on facts related by other witnesses, nor on a hypothetical case, but only to give his opinion on facts observed by himself, and the witness is distinguished from the rest of the world, not by any special aptitude, but only by the opportunity he has had to see the subject matter. In these cases, where the facts are too minute, numerous and evanescent to be given in detail, the witness, after stating his observations and describing the facts to the best of his ability, may state his opinion, which is the result of the grouping of those minute facts. Such is the case in questions of hand-writing, insanity, genuineness of a post-mark, the state of health or of the affections of a person, the value or identity of property, the condition of a person as to sobriety or drunkenness, and numerous other cases. A witness who saw a person write but once, and that twenty years before the trial, has been allowed to give his opinion whether a signature was genuine.

In cases of handwriting, disputed identity and many other cases, it would be impossible for the witness to describe to the jury the difference between the different signatures, persons or animals, with sufficient minuteness to enable them to determine the case, and opinions must of necessity be taken. In this case the evidence on the question of continuity of lode is not brought up, and from what appears it is not easy to say, either from the pleadings or evidence, whether or not it appeared there were openings on the veins from the No You Don't to the Montreal, unless the works shown by the maps are assumed to be all on one vein, a point disputed by the appellant. If the openings on the veins were not continuous, it would be a case for expert testimony and opinions might be taken as deductions from what did appear. If the openings were in matter, claimed to be continuous vein matter, still it has been the constant practice in this Territory and in California, to receive the opinions of witnesses in cases when the claim of continuity is disputed. If the subject matter was

one of common observation and of which a jury was sup-posed to have knowledge and experience, on a description of the mere facts, why did a large number of witnesses who saw these facts differ so widely in their conclusions? So far as the case appears from the record, there does not appear to have been any error in receiving the testimony of experts.

But if it was not a case for strictly expert testimony, it was one in which a bare statement of the facts observed by the witnesses would not give the jury sufficient knowledge to determine the issue. In such case it must first be assumed that the jury know what constitutes a mineral vein, what matter and quality of matter and appearances prove continuity; and, then, that the witness can give the numerous and minute facts in evidence so clearly that the jury can get a full under-standing of them.

While opinions are not the safest evidence, and are liable to lead to great abuses, when they constitute the best available form of evidence they must be resorted to from necessity.

It was admitted on the trial that the vein, from the Montreal up to certain points marked on the maps, was continuous. The respondents claimed it was continuous to the No You Don't discovery. Hence the point or points at which the con-tinuity was contested must have been at or above those marked on the map, and the respondents were allowed to give evidence that the points marked were within the surface lines of the Nez Perces patent, and on the admission of this evidence the fifth error is assigned.

The appellant claims that this evidence is contradictory of the sworn allegations of the answer. The parties agree on the continuity up to certain points in the workings, and the effect was to confine the dispute to the ground above. It was surely competent for either party to show the court and jury the sur-face points vertically beneath which the agreed points in the underground works were situated, and such is the whole scope of the evidence. It merely fixed the surface as well as under-ground points at which the dispute began, and had no tendency

to contradict anything in the pleadings. This question, however, is argued on the supposition that the evidence tended to prove two veins, or was introduced as a foundation to give effect to the Nez Perces' patent, and hence was repugnant to the respondents' answer. While this effect of the evidence is not very obvious yet it will be considered in connection with the objections to the supplemental answer, and to the chains of title introduced by respondents, based on their alleged repugnancy to the answer, questions which have been passed by above. All these objections are on the claim that the respondents, inasmuch as they set up that the vein is continuous, and that the No You Don't patent carries it, cannot show any other title to the demanded premises.

The appellant in his brief says the issue was on the continuity of vein.

The issue really was as to the ownership and right of possession of the demanded premises. Had the respondents held these patent titles at the commencement of the action, they could have put them in evidence, if they tended to prove title to any part of the premises in dispute; and if any one or all of them covered the vein for the entire length of the dip, that fact could have been shown.

By pleading these titles specially and alleging all were on the same vein, but that one conveyed the whole of it, were they deprived of the right to use the other titles?

No case has been cited establishing any such rigid rule of pleading. The issue being as to the title, the respondents alleged they had it by various grants. It is true they alleged the vein was continuous, and one title sufficient; but the allegation that there was but one vein must be regarded as the opinion of the respondents. The evidence given shows that statement was a matter of opinion and belief, and not a well known visible fact apparent to common observation, and concerning which those who had opportunity for observation could not differ; for, at the trial, a large number of witnesses, and with the aid of a year's additional work and developments,

subsequent to the making of the answer, did differ on this question.

The case is analagous to one of boundary. If a defendant is sued in ejectment, may he not plead that the demanded and other premises all belonged to his grantor, that he has three or more several deeds from the grantor: the first being for premises within the bounds of which lie the demanded premises; the second, for a smaller tract, but including the demanded premises; and the third, for a still smaller tract, but also including the demanded premises? There seems to be no repugnancy in these allegations, and if this question of boundary was one of doubt, and the defendant failed to establish that his first title included the disputed ground, there would seem to be no reason why he might not defend on the other titles.

The allegation that the Nez Perces Chief and Third Westerly Extension of the Telegraph claims were on the same vein, was in effect alleging that they held the vein if the No You Don't did not. There is a hypothesis in the position to this extent; the respondents say, we own the vein under the No You Don't patent; if not under that, then under other titles.

There is no hypothesis on the issue of *ownership;* the allegation is positive on that point. The hypothesis only relates to which of two or more titles carries the premises, and in no wise prejudices the appellant, between whom and the respondent the question is, who owns the premises; not under what particular title it is owned.

The sixth error assigned is on the exclusion of evidence offered by the appellant to show the No You Don't location had been abandoned; that the application for said patent was a fraud on the appellant, and the patent had been obtained on false proofs. This was offered to show that the respondents could claim no rights under that patent in this action.

The seventh assignment of error is on a like offer respecting the Roman Empire patent, but such offer does not appear in

13

the record. The whole question, however, is raised by the single offer appearing.

It is manifest the appellant and respondents held widely different views as to the effect of the patent titles; the latter claiming they were conclusive evidence of title in the action; the former that they were only *prima facie* evidence and could be attacked and shown to be invalid.

The practice act provides that there shall be but one form of civil action for the enforcement of private rights, or the redress of private wrongs, but the inherent distinction between legal and equitable causes of action, and the remedies appropriate to each are not changed. *Zeile* v. *Moritz*, 1 Utah, 283.

It is also provided, C. L. § 1263, that the only pleadings on the part of the plaintiff shall be the complaint and demurrer to the defendant's answer, and § 1290 provides that " the allegation of new matter in the answer shall, on the trial, be deemed controverted by the adverse party."

It is conceded that in an action of ejectment, in certain cases a patent of the United may be shown to be invalid; instances are, if the patent is void on its face, or issued without authority, or its issue prohibited, or when the government by reason of a prior grant had no title. The distinction between such cases, and those in which the patent is held to be conclusive evidence of title in an action at law is this: Where the government had the title, and it passed by the grant, it can only be recalled, or made subject to equitable interests of other parties by an action in equity brought for that purpose. In such cases, although fraud may have been practiced, or other parties hold superior equities, the patent is not void, but only voidable in equity. If, however, the government does not have the title, or the issuance of the patent is unauthorized or prohibited by law, no title passes by the grant, and this fact may be shown at law or in any court in which the void instrument is produced as evidence of title. The adjudged cases in regard to the effect of patent title are too numerous to cite, but an examination of the cases cited by the respective counsel

in this case will be sufficient to justify this principle of distinction. It is unnecessary to cite authority that a conveyance otherwise formal and between competent parties is only voidable at the instance of parties defrauded, and that if they acquiesce, the conveyance is good, notwithstanding the alleged fraud. It is argued, however, that the patent was issued without authority, and was therefore void, if the No You Don't claim had been abandoned, or the other facts existed which the appellant offered to show. The want of authority which will make an instrument of this kind void, is a total want of authority to issue a patent for the subject of the grant, not a latent impropriety in exercising the authority, by reason of unknown imposition moving to its exercise, when the proofs authorizing the act are formal and sufficient.

The case on trial was strictly a law issue, tried as such before a jury, and in addition to the objections that a patent which passes title cannot be impeached in such an action, and before a court so constituted, there are other serious objections arising out of the state of the pleadings. While it is conceded that, under the system of code pleading, an equitable defense may be set up in an action of ejectment, it is also well settled that such defense must contain all the essentials of a bill in equity, and the issue thus made is triable by the court without a jury, as an equitable issue. *Gibson* v. *Chateau*, 13 Wallace, 92–103; *Basy* v. *Gallagher*, 20 Wall. 680; *Bruch* v. *Reason*, 42 Cal. 349; 34 Wis. 486.

The appellant contends that he had no opportunity to attack the patents by his pleading, and that the statute controversion of the answer gave him the right to introduce evidence as fully as if he had brought an action in equity—that is, to show everything necessary to overcome the defense set up. This claim cannot be maintained to such an extent. Under the statute the plaintiff can undoubtedly show any matter strictly controverting the answer; but in so doing cannot introduce into the case, by his evidence, a new cause of action. Yet such was the attempt here. The appellant had brought his action affirming

he had the better legal right. On the trial he sought to recover on an equitable cause of action, which in effect admitted the superior legal title of the respondents, but claimed there were equitable grounds for subjecting that legal title to his better equities. A verdict of the jury for the appellant based on such grounds, followed by judgment, would leave the parties in an anomalous condition. There would be a verdict and judgment at law against the respondents while they held and continued to hold the better legal title.

There would be nothing on the record to show why this was given, and no judgment subjecting the legal title to the appellant's equity, by an injunction against enforcing it or by a decree for its conveyance, nor in fact anything to show why such a judgment had been rendered. The cases cited to show that an equitable defense might set up establish nothing in favor of a plaintiff in such a case as the one before us, because as shown, an equitable issue is there made and tried as such, and before a court competent to give a judgment suitable to the demands of the case, and after that issue is tried then the legal issue is disposed of with the aid of the judgment of the court on the equitable issue, which, if it subject the legal title to the equity of the defendant, leaves the defendant with the better title on the trial of the legal issue.

Considering the peculiar nature of this action of ejectment, and that it is a question as to which has the better title, it would seem that before a defendant can prevail on an inferior or equitable title, he must first, in equity, subject the better title to him; and so are the authorities under similar statutes to those prevailing in this Territory. 15 Barb. 365; 34 Wis. 486; 35 Wis. 631.

In the case in the 15 Barb. Judge HAND says: "I do not understand there is any equitable defense, simply as a defense, in an action of ejectment. The effect of that might be to keep the legal title and the possession forever separate."

This case is followed by the others cited, in which it is in effect held, that where an equitable defense is set up in an

action of ejectment against a better legal title, it must not only be as a defense but as a counter claim. The defendant must become an actor and ask affirmative relief. This will be made more apparent by a reference to the nature of the proceedings before the code. Had the appellant brought an action of ejectment on a better title, the respondents, under the old system of pleading, must have stayed the action, filed their bill in equity, become actors asking affirmative relief, and subjecting the legal title to their equitable rights. These principles are not changed by the code. There are, therefore, no analogies to support the appellant's proposition in the provision allowing equitable defenses.

It is manifest that the statute denials of the answer cannot take the place of a bill in equity on which to grant affirmative equitable relief, nor could the jury on the trial of a law issue give any such relief.

Some cases may be found where conveyances under State laws are declared void when made under certain circumstances, and where they have been permitted to be shown to be void in actions at law. These cases depend on State statutes, and are not like the one now under consideration; and in case of a United States patent it is not competent for any State or Tertorial legislature to say what its effect shall be, or to avoid it otherwise than in accordance with the settled rules of jurisprudence.

Although not within the assignments of error, it was argued that the evidence showed the patents lying below the No You Don't void, because the respondents alleged there was but one vein. The evidence tended to show that the strike or outcrop of the vein ran northeasterly and southwesterly, and that the No You Don't is laid on the general course of the vein.

It seems to be conceded, and this objection is based on the assumption, that the Nez Perces Chief and the Third Westerly Extension of the Telegraph occupy different sections on the dip of the vein, if there is but one. If, as respondents claim, there is but one vein, then it is claimed by the appellant there were

no mineral discoveries upon the locations of the two claims last named, and no veins which could be patented with the surface, and that as the respondent, Holden, testified he knew, at the time these patents were applied for, that all were on the same vein, the patents are void. The appellant, as has already been shown, is not in a position in this action to avoid these patents for these reasons.

It cannot be doubted but that the patents passed whatever title the government had to the surface, and any vein or veins beneath it not otherwise granted. As to the surface, it is a matter between the government and the respondents; the appellant has no standing in that respect.

It will be seen by a reference to the maps in evidence, that each of these patents cover different lengths on the vein, not within the protracted end lines of any other patent, so that each does cover a portion of the vein not embraced in other patents.

As to a mineral discovery, the law requires that the land located must belong to the United States, and that no claim shall be located until the discovery of the vein within its limits. The patents presume a compliance with the mining laws, and there is no proof that a lode was not discovered within the limits of each claim. The maps show extensive workings beneath each. The law was complied with if a lode was discovered, and the locations were not void because by subsequent developments it might prove to be on the dip of a section of the lode previously located. The question would then arise between the claimants, and the older claimant might or might not insist on following his lode as he chose. At all events, before he did so, and before the second locator was ousted from the possession, the later claim would be patentable as mineral land containing a lode.

The government holds its mineral lands for sale, and its officers are not restricted from granting such of them as contain a mineral lode because at some future time one locator may trace out another. These are questions concerning which

the government does not inquire. It is enough that there is a lode in the ground in possession of the claimant, who in respect thereto has complied with the mining laws. Neither can it make any difference that the several claims have come to the possession of one party.

The eighth assignment of error is on the instructions given for the respondents from number two to twenty inclusive.

The second instruction is objected to on the assumption that it overlooks rights which may be acquired by bare possession and without other right. The instruction, in terms, seems to admit such rights may exist.

The third instruction is substantially in the words of the law, and if the appellant desired a fuller explanation he should have asked it. The appellant, while setting out in his complaint the location of the Montreal, nowhere alleged that it was marked on the ground, or that it was located in accordance with the requirements of the act of Congress; nor did the answer of the respondents admit the regularity of the location.

Appellant, in his brief, refers to the answer to the cause of action for an accounting, which was not before the court as a pleading in connection with the trial of the count for ejectment, nor put in evidence as an admission.

The objections to the instructions from four to fourteen, inclusive, and those numbered eighteen and nineteen, are disposed of by what has been previously said, and require no further explanation, except as to the effect of the Nez Perces Chief patent. That patent is founded on a location junior to the location of the Montreal, and the court on the trial gave the same conclusive effect to this as to patents founded on older locations. In accordance with the views previously stated that patent granted a perfect title in this action to whatever was the subject of the grant, at least from its date, and hence was a defense, if it carried the Montreal vein, to the extent provided by C. L. § 1481. But as the respondents proved the date of location, conveyance of the possessory title down to

them, the date of entry, and that the patent was founded on that location, it was given effect by relation to a time anterior to the commencement of the action.

This legal effect is a part of the patent title and overreached the appellant's action, and the date of the acquisition of his title.

The fifteenth, sixteenth and seventeenth instructions relate to Montreal surface ground, outside of any of respondents patents, concerning which nothing has been heretofore said. The respondents denied the alleged ouster, but it was proved that they occupied portions of the area, bounded by the side lines, from four to five hundred feet in length. From the evidence it would seem this portion is near the works of the mine, and whether any or what portion of this length is within the Roman Empire patent does not appear, and it must be assumed the respondents took possession of some part of the surface outside of the lines of that patented claim. It is not claimed the respondents had any title or right of possession to this surface. The instructions given are based on the contingency that the jury should find the respondents owned the Montreal vein; and as a locator has no right to the possession of mineral land except as the possessor of a vein in it, that the appellant had no title or right of possession to the surface. It is argued that if appellant had no title or right of possession, but had the actual possession, he could not be ousted by one also without right. This is unquestioned and is clearly implied in the instructions. The question was whether the appellant had possession. If he was without right of possession, he must have had such a possession as would enable him to maintain trespass. This was the question submitted to the jury, and it becomes necessary to look to the evidence to see whether the case was so clear for the appellant that such submission was error.

The appellant testifies that he and his co-owners, Berassa and Duronzo, worked the mine, dividing profits, until February, 1876. The two co-owners then sold out to Morris, and

he to Wadsworth, Myers and others, who went into posses-
sion and worked the mine, but never accounted to the appel-
lant, and he adds, " after Berassa and Duronzo sold out I was
not in the actual possession of it; I was out when they (Wads-
worth and others) took possession of it, and never been in pos-
session since; that was in February, 1876."

The testimony of John W. Kerr, one of the purchasers of
the two-thirds interest in February, 1876, is, in substance, that
while they worked the mine, the appellant was never in pos-
session or had anything to do with it, and his right to an
accounting was denied. He also gives the names of the par-
ties interested on page 107 of the record, where the name of
" King " is evidently misprinted " Kahn."

The testimony of this witness, and also the testimony of the
respondent, Holden, show how the respondents acquired pos-
session of the Montreal vein, and so much of the surface as
they occupied. After claiming they had traced out the Mon-
treal from the No You Don't down, they commenced an action
against those working the Montreal and obtained a preliminary
restraining order. A settlement was then made by which the
respondents purchased of the possessors of the Montreal other
mining property and the possession of the Montreal.

The witness Holden, in regard to this says, he " purchased
this piece," and that the main object was to get possession of
the property and continue to work without interruption. The
occupants turned over the possession to the respondents.

In this state of the evidence there was no error, at least as
against the appellant, in submitting to the jury the question
of the possession of the appellant at the time the respondents
entered. Assuming the contingencies submitted, that the
appellant was without right, it does not seem he had such a
possession as would enable him to maintain trespass.

The appellant also objected to, and assigns error on, the
twentieth instruction. Under the evidence there seems to be
no error in this.

The alleged error is based on the assumption that the

respondents having purchased two-thirds of the Montreal, became tenants in common with appellant, and are estopped from denying that title. The respondents do not, in the action, set up that title, or claim under it. It is a fair inference from the evidence that they did not enter under that, but under the claim of an adverse title; at least the evidence on this point was sufficient to submit the question to the jury, and the fact that the respondents paid the owners of the two-thirds interest something, pending litigation, to get out of the way and yield the possession, cannot bind them to any allegiance to that title. In so far as the instruction relates to a mining partnership, it is fully supported by the evidence, or rather, want of evidence of such a relation.

As most of the instructions asked by the appellant are the converse of those given on the part of the respondents, it will not be necessary to notice them in detail.

The third instruction asked was erroneous because it declared it was sufficient if the notice of location described the claim. The law provides, not only for a description in the notice, but also that it shall be marked on the ground. The instructions numbered from the fourth to the tenth inclusive were properly refused. They seem to be based on the idea that the respondents entered under the Montreal title and then bought in the adverse title. There is no evidence of this kind.

From the verdict of the jury it is evident that the question of what is or is not a mining partnership could have nothing to do with the case, and did not enter into their consideration of it.

The eleventh and twelfth instructions asked by the appellant have been passed upon in considering other propositions.

The thirteenth instruction recites that the appellant claims one-third of the surface and vein of the Montreal; therefore, if the respondents own the vein, he is entitled to surface.

It will be seen this asks the court to direct a verdict for surface ground, and wholly ignores the question of the sufficiency

of his possession to maintain the action irrespective of right, and even assuming the jury find he is without right.

The instructions given at the request of the parties and by the court, fairly submitted the questions raised, and the judgment should be affirmed with costs.

SCHAEFFER, C. J., concurs.

BOREMAN, J., delivered the following dissenting opinion:

Four persons together located the Montreal mining claim, two of such persons holding two hundred and fifty feet each, and the other two holding five hundred feet each. They all worked the mine together, each bearing his share of the expense and receiving his share of the profits. The two smaller shareholders were bought out by the plaintiff, the appellant, thus making him the owner of one-third of the claim, that is, five hundred feet. The appellant and the other remaining two owners continued the working of the claim as before, each bearing his ratable share of expenses and receiving his proportion of the profits. After this had gone on awhile, other parties bought out the two-thirds of the claim not owned by appellant, but the same manner of working the mine and division of the expense, loss and profit, continued. Subsequently the respondents, the old Telegraph mining company, and L. E. Holden, made a purchase of the two-thirds interest, not owned by appellants, they thus becoming the owners of one thousand undivided feet in said location, the appellant remaining the owner of one-third thereof. The respondents, however, having come into possession of the ground, refused to recognize appellant's right or to allow him any share in the workings of the mine, but excluded him therefrom and from the location.

The appellant thereupon brought his action to recover possession of his said one-third interest, and for an accounting and for an injunction. The respondents made answer that he (appellant) had no rights therein, but that they were holding possession adversely—under an older location—the No You Don't, and that the No You Don't and the Montreal were

upon one and the same vein. Afterward, respondents filed a supplemental answer, claiming to have received patents from the General Government for the No You Don't claim, and the Nez Perces, the Third Western Extension of the Telegraph, the Roman Empire and the Montana, and to have purchased a claim called the Grecian Bend. That the vein located as the No You Don't, with its apex in the No You Don't, in its dip and downward course passes under and through all of the above named localities, and that it is an unbroken and continuous vein from the No You Don't through all of these localities and into the Montreal; that the No You Don't and Montreal are one and the same vein, the Montreal being embraced within the parallel end lines of the No You Don't, extending vertically downward, and that the No You Don't, being the older location, controlled.

A jury trial being had, the verdict and judgment were for the respondents, and thereupon the appellant brought the case to this court. A majority of this court have affirmed the judgment of the District Court, but as I deem that a variety of errors were committed in the court below, whereby the case was not fairly placed before the jury, I am unable to unite with the other members of the court in affirming the action of the court below.

A supplemental answer was filed by respondents in the court below. The appellant moved to strike it out, specifying the objectionable parts, which taken together, composed the whole supplemental answer. One part could thus be stricken out and the other parts remain. It was urged, however, that as this answer had been filed by leave of court, it could not thereafter be stricken out on motion.

Our practice act (§ 66) provides that, in proper cases, parties may be allowed to file supplemental pleadings, but it does not say that objections thereto may not be taken in the usual ways, by motion or demurrer. The general rule as to motions laid down in the practice act (§ 57) is, that "if irrelevant or redundant matter be inserted in a pleading, it may be stricken

out by the court on motion of any person aggrieved thereby." There are no words saving supplemental answers from the application of this rule.

No patents are set up in the original answer, but a variety of them are set up in this supplemental answer, and amongst them are the patents to the Nez Perces Chief and the Third Westerly Extension of the Telegraph. Yet nowhere, either in the supplemental or in the original answer, is there not a single allegation or statement bringing either the Nez Perces Chief or the Third Westerly Extension of the Telegraph into connection in any way with the merits of the case. Nothing whatever is claimed under either of them. No portion of the vein or surface ground of the Montreal is therein claimed under either of them. It would seem, therefore, that they were both immaterial and irrelevant to the issues involved in this case, and that such portions of the supplemental answer as set them up should have been stricken out.

Nothing was claimed under either of the other patents, except the No You Don't. They were merely stated as having been obtained by the respondents, yet the respondents clung to exactly the same position held in the original answer, namely, that they claimed under the No You Don't location, and that the Montreal and the No You Don't were one and the same vein. If nothing be claimed under a patent, and to claim under it would be wholly inconsistent with the real cause of defense set up, I do not perceive how such patent could at all affect the case. It would be immaterial to the issue.

There were several questions at issue, the most material ones being as to the continuity of the No You Don't vein into the Montreal, and as to abandonment of the No You Don't location. The issuing of the patent to the No You Don't would not tend to solve either of these questions, nor any minor question involved. The respondents would still have to meet these questions by other evidence, just as they would if no patent had existed. The patent, therefore, to the No You

Don't, was a wholly immaterial matter, and should not have been set up, and if set up should have been stricken out on motion.

Upon the trial these patents were offered in evidence and admitted over appellant's objections; and it is claimed that the patents are conclusive evidence of respondent's title in this action.

The patents may be and no doubt are conclusive evidence of title as against all who set up claims subsequent thereto, but the whole current of authority, some of the very authorities quoted in the opinion of the majority of the court in this case, show that such a position is untenable.

A patent is *prima facie* valid, yet this presumption of validity may be rebutted. It is true that in United States Courts this rebuttal can extend only to the length of showing the patent void *ab initio* by reason of the fact that the land was not subject to entry, or that the officers had no authority to issue the patent, or that the land had been previously granted to another, or been reserved from sale. But the reason given in these decisions why the United States Courts in cases brought in these courts, can only go to the extent indicated is, that by the process act of 1792 such courts are compelled to rigidly maintain the distinctions between proceedings at law and in equity in the same suit. *Bagnell* v. *Broderick*, 13 Peters, 446; *Fenn* v. *Holmes*, 21 How. 481; *Bennett* v. *Butterworth*, 11 How. 669.

If, therefore, this be purely an action at law, and governed by the process act of 1792, the patents are conclusive, except upon the grounds specified.

If, however, we were working under this rigid rule, yet some, at least, of these patents should even then be rejected. The evidence of the respondents themselves shows that no vein of mineral bearing ore was ever discovered within the surface limits of either Nez Perces Chief or Third Westerly Extension of the Telegraph, and that none existed there except that of the No You Don't, and that these facts were well

known to those applying for the patents. As admitted in the majority opinion, a patent thus issued is void, and if so they could not be upheld as a defense, and the fact that a party desired surface ground can be no justification for violating law in this or any other case.

But the Territorial courts are not subject to the Process Act of 1792. It is now a well established doctrine that the courts of the Territories are not bound by the laws governing United States courts as to pleadings and practice. *Hornbuckle* v. *Toombs*, 18 Wall. 648.

And this doctrine of the Supreme Court of the United States has been confirmed by an act of Congress entitled: "An Act concerning the Practice in Territorial Courts and appeals therefrom," approved April 7, 1874.

The Supreme Court of the United States in the case of *Hornbuckle* v. *Toombs*, very justly remarks that "the enforced separation (as in the United States Courts under the Process Act of 1792,) of the two remedies, legal and equitable, in reference to the same subject matter of controversy, leads to interesting exhibitions of the power of mere form to retard the administration of justice."

But the Supreme Court of the United States has gone further, and does not leave us to deal only with the general principles laid down. It has recognized the authority to set up equitable defenses in actions at law in cases coming from State courts, where the State laws authorize such commingling of legal and equitable matters. *Minnesota* v. *Batchelder*, 1 Wall. 115; *O'Brien* v. *Perry*, 10 Black. 132.

In this Territory this commingling of law and equity is authorized by statute (C. Pr. Act, § 64) and allows equitable defenses to be set up as a bar to recovery in actions at law. C. Pr. Act, § 49.

Whatever grounds would, therefore, in equity be sufficient to set aside a patent, so far as the same conflicted with the rights of the adverse party, may be shown to defeat the patent in an action at law. And it is a recognized doctrine that in

suits in equity between the parties claiming land, the courts will inquire into the facts of a disputed title under a patent and if necessary reject the patent. *Comejoys* v. *Vasee*, 1 Pet. 212; *Garland* v. *Winn*, 20 How. 8; *Lyle* v. *Arkansas*, 22 How. 192; *O'Brien* v. *Perry*, 1 Black. 139; *Lindsey* v. *Haws*, 2 Black. 554; *Cunningham* v. *Ashley*, 14 How. 377.

The theory of the code practice is to settle all conflicting rights as to the same subject matter in one suit, and thus discourage a multiplicity of suits. Under our Practice Act, which allows of equitable defenses, the validity of the patents set up may be inquired into, and if necessary rejected, in actions at law.

Were the objections urged against these patents, therefore, either in law or in equity, sufficient to reject them or render them invalid as to appellant?

The appellant objected to the -No You Don't patent upon the grounds that the location had been forfeited and abandoned before the location of the Montreal, and that neither the locators nor their assignees reoccupied the ground until after the Montreal location had been made, and that the affidavits upon which the patent issued were false and fraudulent. The rule of law is that when a party abandons a location the ground is open to location again by any other or the same party, and that the original locator cannot again return to re-occupy the land under his abandoned location; if it has in the meantime been located and held by .another, the intervening locator takes the priority. If, then, this condition of affairs could have been shown by the appellant, as was offered to be done, his rights were in equity superior to those of the patentee, in whom there was an utter want of right. This defense to the patent was a complete one, and should have been admitted.

As heretofore stated, the evidence of respondents showed that no mineral vein was discovered in either the Nez Perces Chief or in the Third Westerly Extension of the Telegraph, and that the applicants for the patents to these claims well knew this fact. Upon the application of the respondents, the

court in one of its instructions (fifteenth) for the respondents, correctly stated that the right to surface ground depended upon the discovery of a vein within the surface limits, and that if a party had no title to any vein under a location, he can have no title to any surface ground. Yet the respondents were allowed to introduce those patents as evidence to the jury, and the patents were declared to be conclusive evidence of respondents' title. Can a man recover, in either an action at law or in a suit in equity, upon void title papers? Such patents should not go to the jury, and if once admitted they should be stricken out of the evidence when their true character should become known.

Two of the patents were objected to (especially that of the Roman Empire, which embraced the discovery shaft of the Montreal) upon the grounds, which the appellant offered to prove, that the boundaries had been changed after the locations were made; that the locations as made, and as they existed prior to the patents, did not show any conflict with the Montreal nor were they contiguous thereto, yet as these boundaries appeared in the patents they embraced parts of the Montreal ground, and that such patents were obtained upon false and fraudulent affidavits. Such changing of boundaries was wholly unauthorized and a gross violation of the rights of appellant. When these patents were applied for there was no surface conflict, nor any conflict below ground, between them and the Montreal. The Montreal claimants, therefore, could make no objection to issuing the patent even if they had known of the application. The bare possibility that two lodes are the same would not warrant a protest against issuing the patent. (Week's Min. Lands, p. 249–250.) The issuing of a patent is a ministerial act, and the patents are based upon *ex parte* affidavits, and, indeed, the whole proceedings in the application for and granting of patents are *ex parte* and summary, and the courts can look beyond them. They do not contemplate a litigation of the rights between the applicant and third parties

14

but only between the applicant and the government. *Minnesota* v. *Batchelder*, 1 Wall. 115.

The evidence to show the change of boundaries should have gone to the jury, and the patents should have been declared to be no defense.

But respondents were not willing to risk their defense upon the patents alone. They introduced evidence to show that they had complied with the requirements of the law in the matters preliminary to the patent and necessary to make valid locations. Such evidence was wholly unnecessary if the patents were conclusive evidence of title. The appellant offered to prove a contrary state of facts, and that the law had not been complied with in the preliminary steps. I can see no valid reason why this should have been refused him. If one party has the right to show that the acts necessary to be done were done, the adverse party should have the privilege of showing the reverse.

It is urged, however, that the appellant cannot avail himself of any of these objections to the patents because he did not in terms plead them. It would seem that it is not necessary to plead abandonment, (*Bell* v. *Brown*, 22 Cal. 671,) but we will assume that it is necessary to do so.

Under our system of pleading the appellant could file no pleading in which any of those objections to the patents could be set up. The objections are matters of defense and no part of appellant's cause of action. A complaint cannot contain defensive matters, but only a statement of such facts as constitute the plaintiff's cause of action. The filing of a supplementary complaint could not remedy it, for such a pleading could no more than the original complaint contain anything not going to make up plaintiff's cause of action. It could not state his cause of defense to new matter in the answer. That is the office of a reply, but under our system of pleading a reply is not allowed, nor is there any other pleading allowed which could take its place. If a party have no opportunity to show a fact by his pleading, he may exhibit the matter thereof

in evidence, and the court and jury are bound thereby. 13 How. 307.

But we are not left to this rule of simple justice without a statute. Our Practice Act fully meets the difficulty and makes ample provision therefor, by prescribing that the new matter of the answer shall be " deemed controverted by the adverse party." (§ 65.) Thus all defenses, legal or equitable, which the plaintiff may have to the new matter of the answer, shall be treated as expressly pleaded. The law itself makes the reply. No written reply could have more effectually met the case. The objections to the patents, therefore, were by the law treated as.pleaded, and as completely so as the party himself could have done. The appellant was entitled to be heard in support of his reply, and the evidence offered for that purpose should have gone to the jury.

But it is said further that the plaintiff could not urge his objections to the new matter of the answer, for the reason that he had no vested rights in the Montreal, and consequently could not be injured.

The plaintiff owned a one-third interest in the Montreal location, and had been in possession with the other owners, and was ousted of possession by defendants, Whatever questions might exist between the government and the locator or his assignee as to vested rights, there can be no possible doubt that as between the locator and a third party the locator or his assignee had some rights, which the law guaranteed to him. The government had authorized him to locate the ground, and said that he should have the exclusive right to purchase the vein and certain specified surface ground. If the locator was not, as against a third party, entitled to the possession of the ground, he was at the mercy of any trespasser who had the physical power to dispossess him. Our laws authorized the first locator to sue for the possession; it is a good ground upon which to base ejectment. If he were not vested with any right in the property or in the possession, then the law authorized him to hold that which he had no right to hold, and to

sue for possession of that in which he had no right. It is not probable that such a condition of things was ever contemplated by the law. The Supreme Court of the United States recognizes there that the locator has "legal rights," and such as should be protected by the courts. *Shepley* v. *Cowan*, 1 Otto, 338; *Lyle* v. *Arkansas*, 9 How. 328.

It is admitted that the appellant could go into equity and enforce his rights. What rights? If he had no vested rights in this property or its possession what grounds had he for equitable interposition? In California the rights of the locators are fully recognized as vested, and this we deem to be the established doctrine. It cannot be allowed that a *bona fide* locator, as to his mine, has no rights which anyone need respect.

A portion of the Montreal was outside of the surface ground of all the patents, and parts of the workings of the Montreal were outside of the patented surface of any of the claims; but the Roman Empire patent covered the discovery shaft of the Montreal. Such parts as were outside of the patent could not be held under the patent unless it was on the dip of the patented vein, and within its end lines. But this is not claimed to be the case as to the Roman Empire. The appellant could not be ousted of such ground as he held possession of, when the party ousting neither had or claimed any right thereto. A party in possession of land, although a trespasser, cannot be ousted of his possession except by him who is entitled thereto. He who forcibly ejects another from mining land cannot justify his action by pleading that the title was in another and not in him whom he dispossessed.

It is said that expert testimony was improperly allowed respecting the identity of the No You Don't and the Montreal lodes. When the subject matter of inquiry is one of common observation or common knowledge upon which lay or uneducated minds are capable of forming their judgment, experts are not allowed to express their opinions; but in matters of science, or art, or skill in some particular profession or busi-

ness their opinions are admissible. *Hastings* v. *Steamer Uncle Sam*, 10 Cal. 331; *Milwaukie* v. *Kelley*, 94 U. S. (4 Otto,) 472.

In the case at bar the workings showed all the evidence that was claimed to exist as to the identity of the No You Don't and the Montreal veins. It was claimed that the No You Don't vein had been traced into the Montreal vein by the workings exposed to view. It would seem that no scientific knowledge, nor any knowledge above that of common observation was necessary to tell whether this had been done or not. If the connections between these two alleged veins had not been made, and the whole line of the veins had not been opened to view, the opinions of scientific men would have been the highest character of evidence in ascertaining whether the two veins were one and the same; but when that question is claimed to have been solved by the tracings, such opinions would appear not to be necessary.

The respondents were allowed to prove that the apex of the Montreal vein was within the surface boundaries of the Nez Perces Chief. There was no such claim in the answer or in the supplemental answer, but the defense set up was that the apex of the Montreal was within the surface ground of the No You Don't. This the appellant was required to meet. If respondents are not to be confined to their defense as pleaded, but be allowed to prove a defense wholly repugnant thereto, there could be but little use for pleadings. But pleadings are not snares and traps made to deceive, but are to be truthful statements of causes of action or of defense, and the law requires the parties to be confined to them. Any departure from this just rule thwarts the very object aimed at by requiring pleadings. I do not see that respondents had any right or shadow of right to show that the apex of the vein was anywhere else than in the place alleged in the answers.

The next class of exceptions have reference to the instructions. In the discussion of the general principles I have already considered some of the doctrines involved in the

instructions. Some of those which I have not thus considered I will now notice.

In the third instruction for the defense, which is excepted to, the words of the statute alone are used in specifying, that to make a valid location, "the claim must be distinctly marked on the ground." Without any explanation as to the meaning of these words in the law, it is evident that the jury would be misled. The words should not be taken in a literal sense. Had the jury been told this, and that they meant simply that the boundaries should be designated by monuments, posts, or other similar means, there would have been no ground for objection in the respect to indefiniteness. But there was no issue before the jury as to the boundaries of the Montreal, and on that ground also the instruction was justly objectionable.

The seventeenth instruction for the defense (as the same is numbered on p. 127 of the printed transcript) is likewise objected to. Its meaning is not clearly manifest, but the purport of it seems to be that if parties were in actual occupancy, being present upon the ground, but holding for the owners, and two-thirds of the owners sold their interest to a stranger and induced those holding the possession for the owners to give up the possession to the purchaser of such two-thirds interests, then the said purchaser's title was good as to the whole location, and he could ignore such of the owners as did not consent to this transfer of possession to him. If such were really the doctrine intended to be declared, it would hardly be necessary to say that the instruction could not be upheld, as being at war with both law and justice. Yet such would appear to be the fair construction of its wording. It says that if the jury find that "Kerr, Wadsworth and others were in actual possession of said Montreal mining claim, and that they turned over the peaceable possession to said defendants," etc. What are we to understand from the word "others"? If we go to the evidence we find that it must include the plaintiff (appellant), for Kerr & Wadsworth had no more possession than the appellant. It either included the plaintiff (appellant) or it

assumed that Kerr & Wadsworth were in possession, and that the plaintiff was not, when the evidence shows that neither of them nor the plaintiff were present on the ground. The employees of the owners were upon the ground, but their possession was no more the possession of Kerr & Wadsworth than of the plaintiff. If the word "others" was intended to embrace the plaintiff, then it was not based · ·· facts, as there was no evidence whatever that plaintiff ever turned over the "possession to the said defendants." There was not only an entire absence of any such evidence, but, further, the evidence given showed that the plaintiff had nothing to do with the transfer of possession and did not consent to it. If the word referred to the employees of the owners, then the instruction was not based upon facts, for it assumed that Kerr & Wadsworth were in the actual possession and on the ground, with the employees, and of this there was no evidence. And further, the jury would be led to believe that a delivery of possession by workmen, without the consent of the owner, was in law sufficient to defeat the claim of the owner of the mine to the possession. It may be that nothing which I have shown regarding this instruction was intended by it, but it seems to me that the interpretations I have attached to it are necessary and natural. If any other meaning was intended it should have been more definitely expressed. As the instruction stands it, to my mind, is clearly an improper one.

I do not think the instructions were consistent, and consequently they could not fairly present the case to the jury.

The whole tenor of the twentieth instruction for the respondents is that the patents are not conclusive evidence, but in the nineteenth and other instructions, their conclusive character is declared. It was improperly assumed as a fact proven, in the twentieth instruction, that the respondents had done everything necessary to be done to entitle them to the legal title, when these facts were to be passed upon by the jury. And I think the further objection to the twentieth instruction will hold good, that in giving what purported to be a summary of

the case, the summary was but partial and imperfect. An erroneous doctrine was also conveyed in the same instruction, that a party acquiring possession from two-thirds of the owners could repudiate the claim of the other third, and maintain title and possession under an adverse title. Appellant was ousted of possession on the 10th of April, 1876. On that day the defendants had neither possessory title nor any other kind of title to the No You Don't, or Nez Perces Chief, or Third Westerly Extension of the Telegraph.

These titles were afterward obtained. A party cannot enter by one title and claim by an adverse one to the injury of others interested.

We have now considered all of the principles involved in this case, except the one which was raised in the instructions asked by the appellant respecting mining partnership.

It was successfully maintained in the court below that a mining partnership was in no respect different in their constitution from common trading or commercial partnerships. This I deem to have been error.

Said partnerships may arise by implication, (Rockwell on Mines, 575,) and if in this case a partnership existed, it would strongly tend to show that respondents admitted the rights of appellant to the ground itself, as the right to share in profits of the mine as partners was based upon the fact of such joint ownership.

A species of partnership similar to what is now known as mining partnership was known and recognized under the old Spanish system of mining. They were authorized and promoted under what are known as the "Ordinazas de Minerva" as far back as 1873. Yale on Mining Claims, 261; Blanchard & Weeks' Leading Mining Cases, 547.

Similar parnerships have for a long time been known in Germany. Collier on Mines (side page), 95.

Likewise in England similar partnerships long since grew up from necessity, and, as it appears, without any statutory aid or authority. In Collier on Mines, a small but reliable work

published in England in 1849, and in this country in 1853, it is said that mining partnerships had then been long recognized as a species of trading partnership, but they "were early recognized as differing from ordinary trading partnerships, in not being founded on the *delectus personæ*, from which principle the rights and obligations of ordinary trading partners are mainly derived." And, says that author again, "it was decided after many doubts, that a mining partner had a right either to relinquish or transfer his share without the consent of his co-partners, and that upon his death or bankruptcy, the law instead of dissolving the partnership, would transfer it to his executor or assignee; and the power of partners to bind each other by engagements entered into with non-partners was restricted." Collier on Law of Mines (side page), 90.

Could there be a better description of a mining partnership, as known among us, than Collier has thus given?

That author quotes English cases extending back many years prior to the publication of his volume, in which these mining partnerships were upheld by the courts.

The cost-book system of carrying on mining enterprises, and under which the tin and copper mines of Cornwall and Devonshire were worked, was that of a mining partnership, as contradistinguished from trading partnerships; and Collier says of such cost-book system, that "the principal distinction from ordinary partnerships seems to be the absence of the *delectus personæ*." Collier (side page), 95.

So we find that mining partnerships did not have their birth upon this western coast, but were known and recognized as a necessity in other lands long before California even was known as a mining country. With the increase of mining in California, as elsewhere, these partnerships have grown up and become, as it were, a part of the common law. The courts of California, following the English rule, recognized them as a necessity, and the legislature of that State in its wisdom has not seen proper, after a trial of the system for nearly thirty years, to do away with them.

California has, since 1849 to the present time, been the parent, the leader in the development of the mineral resources of this western portion of our country, and she has stamped her laws and usages upon this whole mining region in and west of the Rocky Mountains. The other mining communities growing up outside of that great State have recognized her leadership, and followed where she led the way in encouraging and nurturing the mining interests. The decisions of the California courts, including those of mining matters, are generally followed in the western mining States and Territories. Blanchard & Weeks, 129–130; *Mather* v. *U. S. G. & S. M. Co.*, 1 Nev. 203.

As a consequence, in Utah for years past, these mining partnerships have, by common consent, been recognized. Miners are accustomed to them, and great business interests have been carried on under them. At this date, therefore, after years of acquiescence by the people generally, it is the duty of the courts to uphold the system and not unsettle mining interests by changing the rule. If that which has become a second nature to mining enterprises, had best be modified or abrogated altogether, let the appeal be made to the legislative authority to do the work, making the proper savings of present acquired rights and interests.

But it is claimed that there is no such partnership in the property. We deem the generally accepted rule to be the reverse. Blanchard & Weeks' Leading Mining Cases, 556, 561; *Nolan* v. *Lovelack*, 1 Mon. 224; *Duryea* v. *Burt*, 28 Cal. 569; *Skillman* v. *Lachman*, 23 Cal. 198; *Dougherty* v. *Creary*, 30 Cal. 290; *Settembre* v. *Putnam*, 30 Cal. 490.

The evidence cleared showed that a mining partnership existed between Miller, Klopenstein, Devorso and Berassa, and that it continued after appellant's purchase, with appellant as partner in the place of Miller and Klopenstein, and this partnership existed until the entry by the respondents. The retiring of partners does not dissolve a mining partnership, nor does the coming in of new partners in their stead, dissolve it. This is

a rule laid by all the authorities respecting the characteristics of mining partnerships. One partner cannot dispute the title of the partnership, nor claim under any other title, and any title which he subsequently acquired inures to the benefit of all of the partners.

If at any time the partnership ceased to exist, the owners became merely tenants in common of the land, and as we have seen one tenant in common cannot avail himself of any outstanding title which he may own or afterward acquire, to defeat recovery by a co-tenant.

For the reasons which I have endeavored to set forth above, I am unable to unite with the majority of the court in their opinions, or in the conclusions to which they have arrived, but believe that this cause should be reversed.